**The STATE of Ohio, Appellee,**

v.

**RABER, Appellant.**

[Cite as *State v. Raber*, 189 Ohio App.3d 396, 2010-Ohio-4066.]

Court of Appeals of Ohio,
Ninth District, Wayne County.

No. 09CA0065.

Decided Aug. 30, 2010.

Martin Frantz, Wayne County Prosecuting Attorney, and Latecia E. Wiles, Assistant Prosecuting Attorney, for appellee.

Clarke W. Owens, for appellant.

WHITMORE, Judge.

{¶ 1} Defendant-appellant, Barbara Raber, appeals from her conviction in the Wayne County Court of Common Pleas. This court affirms.

I

{¶ 2} On the morning of June 2, 2009, a neighbor discovered Barbara Weaver lying on her bed with a gunshot wound to her chest. The neighbor went to check on Weaver after one of Weaver's young children came to her and told her that he had found his mother dead in her bed. Medical assistance arrived shortly thereafter, and the Wayne County coroner pronounced Weaver deceased later that morning. The coroner estimated that Weaver died sometime between midnight and six o'clock in the morning on June 2, 2009. It was later determined that Weaver died from a single gunshot wound fired at close range from a .410–gauge shotgun.

{¶ 3} Eli Weaver, Barbara Weaver's husband and the father of their five children, received a phone call about his wife while on a fishing trip to Lake Erie. Eli had left the Weaver home at approximately 3:00 a.m. that morning. Eli spoke with police when he returned home and initially denied any involvement in his wife's death. He later admitted, however, that he and his girlfriend, Raber,

had planned Barbara Weaver's murder and Raber committed the murder with his assistance.

{¶ 4} Eli and Raber began a personal relationship several years earlier, after the two met through Raber's husband. Eli and his family were members of the Amish community when he and Raber began their relationship, but Eli twice left the community after being shunned for his behavior. Eli had several affairs and met women online through the use of a cellular phone that he received from Raber. When the two began discussing the murder of Barbara Weaver, they sent numerous text messages to each other setting out their plan. Police obtained the text messages during their investigation.

{¶ 5} On June 10, 2009, officers from the Wayne County sheriff's office came to Raber's home to arrest her for Weaver's murder. After officers arrested Raber, they drove her to the sheriff's office and interrogated her. Raber confessed to Weaver's murder during the interrogation but refused to complete a written statement. Raber spent the night in jail, and officers questioned her again the next day about several details of her confession. Raber eventually asserted her right to counsel and ended the interrogation.

{¶ 6} On June 12, 2009, a grand jury indicted Raber on one count of aggravated murder, in violation of R.C. 2903.01, and an attendant firearm specification. On August 21, 2009, Raber filed a motion to suppress, seeking to exclude the oral statements she made to police upon and after her arrest. The court held a hearing on Raber's motion on September 14, 2009. It further held a hearing on September 17, 2009, to announce its ruling on the record before issuing a judgment entry the same day. The court denied Raber's motion. Thereafter, a jury trial commenced. The jury found Raber guilty of aggravated murder and further found that she had committed the murder with a firearm. The court sentenced Raber to a total of 23 years in prison.

{¶ 7} Raber now appeals from her conviction and raises four assignments of error for our review.

## II

### Assignment of Error Number One

The trial court erred to the prejudice of Barbara Raber by overruling her motion to suppress evidence.

{¶ 8} In her first assignment of error, Raber argues that the trial court erred by denying her motion to suppress. Specifically, she argues that the court should have suppressed the statements she made to police upon and after her arrest

because they questioned her after she had made an unambiguous, unequivocal request for an attorney. We disagree.

{¶ 9} The Ohio Supreme Court has held:

> Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. *State v. Mills* (1992), 62 Ohio St.3d 357, 366, 582 N.E.2d 972. Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Fanning* (1982), 1 Ohio St.3d 19, 1 OBR 57, 437 N.E.2d 583. Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard. *State v. McNamara* (1997), 124 Ohio App.3d 706, 707 N.E.2d 539.

*State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. Accordingly, this court reviews the trial court's factual findings for competent, credible evidence and considers the court's legal conclusions de novo. *State v. Conley*, 9th Dist. No. 08CA009454, 2009-Ohio-910, 2009 WL 499309, ¶ 6, citing *Burnside* at ¶ 8.

{¶ 10} Neither party takes issue with the facts that emerged at the suppression hearing or the factual findings reached by the trial court. This court sets forth the facts from the suppression hearing solely to facilitate the legal analysis that follows. Detective John Chuhi of the Wayne County sheriff's office was the only witness who testified at the suppression hearing. He testified to the following events.

{¶ 11} Detective Chuhi arrived at Raber's Millersburg home at approximately 4:20 p.m. on June 10, 2009, to arrest her for Barbara Weaver's murder. Several other officers accompanied Detective Chuhi for the purpose of executing a search warrant on Raber's home. Detective Chuhi met Raber at her door and read her the search warrant. Raber then stepped outside and another officer, Detective Michael Maxwell, placed her under arrest. Detective Maxwell read Raber her *Miranda* rights from a card while Detective Chuhi observed. Raber did not say anything at that point, but Detective Chuhi testified that Raber appeared to understand her rights. He then proceeded to take Raber toward his police car.

{¶ 12} Raber became very emotional as Detective Chuhi walked with her and she stopped to sit down on the tire of a boat trailer. When Detective Chuhi went to help Raber stand up, "she looked at [him] and said, 'can I have an attorney?'" Before Detective Chuhi could respond, however, Raber immediately "bec[ame] more emotional and then started asking [him] questions about her children."

Detective Chuhi addressed Raber's concerns about her children, helped her over to the police car, and placed her in the backseat. He gave her several minutes to compose herself and then sat in the backseat with her as Detective Maxwell sat in the driver's seat. The following exchange took place when Detective Chuhi got into the backseat of the police car:

> As I got in the car I told Barbara [Raber] that—actually repeated back to her what she had stated to me in the driveway. And I said, Barbara, you asked me if you can have an attorney. I then told her yes, you can if you wish. And I asked her, Barbara, do you understand this. She stated yes, I do. I then asked her did you understand the rights that Detective Maxwell read to you. She stated that she did. I then asked her if she was willing to speak with us and hear what we had to say. She stated that she was.

Detective Maxwell drove the police car to the police station while Detective Chuhi briefly spoke with Raber about the investigation. The three arrived at the Justice Center at 5:01 p.m.

{¶ 13} Detectives Chuhi and Maxwell continued to speak with Raber at the Justice Center in their lieutenant's office. They gave Raber something to drink as well as a bathroom break and offered her something to eat. Raber did not ask to speak with an attorney at any point in time during the interview. As the conversation continued, Raber "stated that she did it and that it was an accident." Yet she did not want to give a written statement. The detectives ended the interview at 6:45 p.m. Raber spent the night in the Wayne County jail.

{¶ 14} The following day, Detectives Chuhi and Maxwell went to the jail to speak with Raber a second time. They advised her of her *Miranda* rights again, and she agreed to waive her rights and speak with them. At some point during the interview, Raber stated, "[G]ive me a lawyer." She began to make further statements, but Detective Chuhi stopped her. The detectives told her that the interview was over because she had asked for a lawyer.

 {¶ 15} "[A]fter a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney." *Davis v. United States* (1994), 512 U.S. 452, 461, 114 S.Ct. 2350, 129 L.Ed.2d 362. The burden is on the state to prove that a suspect received and understood the *Miranda* warnings. *Berghuis v. Thompkins*, —— U.S. ——, 130 S.Ct. 2250, 2261, 176 L.Ed.2d 1098. Raber, however, does not argue that she never received her *Miranda* warnings, that she did not understand them, or that she did not waive them. Instead, she argues that she made an unambiguous and unequivocal request for an attorney when she asked Detective Chuhi, "[C]an I have an attorney?" She insists that because she clearly invoked her right to counsel at that point, "[t]he real issue is not

ambiguity, but waiver." She argues that the state failed to prove that she knowingly and intelligently waived her right to counsel once she had invoked it.

{¶ 16} Initially, we note that Raber has largely failed to point to any legal authority in support of her assertion that she clearly invoked her right to counsel. "Invocation [of the right to counsel] and waiver are entirely distinct inquiries, and the two must not be blurred by merging them together." *Smith v. Illinois* (1984), 469 U.S. 91, 98, 105 S.Ct. 490, 83 L.Ed.2d 488. "First, courts must determine whether the accused actually invoked his right to counsel." Id. at 95, 105 S.Ct. 490, 83 L.Ed.2d 488. A waiver-of-invocation inquiry becomes relevant only after a proper invocation occurs. Id. "If an accused makes a statement concerning the right to counsel 'that is ambiguous or equivocal' or makes no statement, the police are not required to end the interrogation [*Davis v. United States*, 512 U.S. at 459, 114 S.Ct. 2350, 129 L.Ed.2d 362] or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights." *Berghuis*, —— U.S. at ——, 130 S.Ct. at 2259–2260, 176 L.Ed.2d 1098. Accordingly, before we address any waiver argument, we first must consider whether Raber actually made an unambiguous and unequivocal request for counsel.

{¶ 17} The question whether a suspect invoked his or her right to counsel is an "objective inquiry." *Davis*, 512 U.S. at 459, 114 S.Ct. 2350, 129 L.Ed.2d 362. Further, a suspect's alleged invocation must be examined "not in isolation but in context." *State v. Murphy* (2001), 91 Ohio St.3d 516, 520–521, 747 N.E.2d 765. "[A] reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel * * * do[es] not require the cessation of questioning." (Emphasis sic.) *Davis*, 512 U.S. at 459, 114 S.Ct. 2350, 129 L.Ed.2d 362. "For example, statements such as, 'I think I need a lawyer,' 'Maybe I should talk to a lawyer,' and 'I think that I would like an attorney' have been deemed too ambiguous to invoke the *Miranda* right to counsel." *State v. Zaffino*, 9th Dist. No. 21514, 2003-Ohio-7202, 2003 WL 23095392, ¶ 58. If ambiguous requests for counsel could suffice for invocation purposes, "[p]olice officers would be forced to make difficult judgment calls about whether the suspect in fact wants a lawyer even though he has not said so, with the threat of suppression if they guess wrong." *Davis*, 512 U.S. at 461, 114 S.Ct. 2350, 129 L.Ed.2d 362.

{¶ 18} In *State v. Stover* (April 16, 1997), 9th Dist. No. 96CA006461, 1997 WL 193333, this court considered the issue whether a suspect ever made an unambiguous request for his counsel. Stover initiated a discussion with police after being indicted and after he had retained an attorney. A detective read Stover the *Miranda* warnings, and the following conversation took place:

Detective: State your name.

Defendant: Shawn, my name is Shawn Stover.

Detective: O.K. Shawn, I have a card here in front of you to read along silently if you wish. You have the right to remain silent and anything you say can be used against you in a court of law, you have the right to talk to a lawyer have him present with you while you are being questioned. If you can't afford to hire a lawyer one will be appointed to represent you. Before any questioning if you wish. You can decide at any time to exercise these rights and not answer any questions or make any statements. You understand these rights as they are explained to you?

Defendant: Yes.

Detective: Right here, yes, or no.

Defendant: My lawyer won't make any money today.

Detective: Yes or no, that you do or do not understand.

Defendant: (Inaudible.)

Detective: O.K. having these rights in mind do you wish to talk to me now?

Defendant: *Yea, but I feel like, talk to my, have my lawyer present.*

Detective: Where's your attorney at?

Defendant: He said he was going to come here he said yesterday, today's Friday right?

Detective: Yea, today's Friday.

Defendant: He said he was suppose to come yesterday or today.

Detective: Having these rights in mind do you wish to talk to me now? You want to talk to me?

Defendant: Yea.

Detective: You sure?

Defendant: *Well I mean, I'd still like to have my lawyer here.*

Detective: Either you want to talk to me or you don't want to talk to me.

Defendant: Well, yea, I want to talk to you but * * *.

Detective: Yea, but * * *.

Defendant: Yeah, I'll talk to you. Yes.

Detective: O.K. Sign that line right here. O.K. I need yes or no on that line.

Defendant: (Inaudible.)

Detective: All right you told a * * * you talked to a person by the name of Kim that you wanted to talk to me * * *.

(Emphasis added.) *Stover* at *1–2. This court held that none of the foregoing, italicized statements amounted to an unambiguous, unequivocal request for

counsel. Id. at *3. We further held that "[t]he detective acted reasonably in asking further questions in an attempt to clarify whether defendant was, in fact, requesting counsel." Id.

{¶ 19} Multiple Ohio courts have reached conclusions similar to the one this court reached in *Stover* when faced with the issue of whether a statement or question amounted to an unambiguous and unequivocal request for counsel. See *State v. Long,* 1st Dist. Nos. C–090248 and C–090249, 2010-Ohio-1062, 2010 WL 989899, ¶ 16 (defendant's statement that he wanted "to speak to a district attorney to obtain a 'deal' " held not to be a request to have an attorney present during interrogation); *State v. Knight,* 2d Dist. No. 04–CA–35, 2008-Ohio-4926, 2008 WL 4369764, ¶ 9, 112 (defendant's inquiry "Well, can I talk to my lawyer then if there is something wrong like that? Do I need one or something?" held to be, "at best, * * * two equivocal requests for counsel"); *State v. Simmons,* 8th Dist. No. 86499, 2006-Ohio-4751, 2006 WL 2639382, ¶ 19 (defendant was only hypothesizing about the need for an attorney when he replied that he would speak to police "with a lawyer and all that stuff, too," repeated upon further questioning, "I'm going to have to get a lawyer and all that stuff there, I mean," and failed to say yes when police then asked, "Oh, you * * * want to get a lawyer"); *State v. Wellman,* 10th Dist. No. 05AP–386, 2006-Ohio-3808, 2006 WL 2057895, ¶ 26 ("appellant's equivocal statement 'I think I need a lawyer, 'cause I don't know what you're talking about DNA,' does not amount to an invocation of counsel"); *State v. Rogers,* 12th Dist. No. CA2004–06–014, 2005-Ohio-6693, ¶ 22–25 (defendant failed to make an unambiguous, unequivocal request for counsel when he asked "if he could 'write [his confession] with a lawyer' "); *State v. Williams,* 10th Dist. No. 03AP–4, 2003-Ohio-7160, 2003 WL 23024526, ¶ 51 ("appellant's asking [police], 'Where's my lawyer?' is not the same as saying, 'I want a lawyer.' It is, in and of itself, an equivocal statement"); *State v. Neal,* 2d Dist. Nos. 2000–CA–16 and 2000–CA–18, 2002-Ohio-6786, 2002 WL 31761564, ¶ 46 ("We find the statement 'I probably ought to talk to an attorney' to be similar to 'I think I need a lawyer,' which the [United States Supreme Court] held was not an invocation of the right to counsel"); *State v. Revels,* 12th Dist. Nos. CA2001–09–223 and CA2001–09–230, 2002-Ohio-4231, 2002 WL 1914277, ¶ 16 (defendant who asked, "Do I need to have an attorney before I'm speaking with you guys?" never unambiguously requested counsel); *State v. Foster* (Dec. 21, 2001), 11th Dist. No. 2000–T–0333, 2001-Ohio-8806, 2001 WL 1647177, at *9 (defendant who asked, " 'Well, can I have a lawyer present?' * * * did not make a request for counsel; he merely asked if he could have a lawyer present"); *State v. Holman* (Dec. 21, 1999), 10th Dist. No. 99AP–92, 1999 WL 1221634, at *4 (defendant never invoked the right to counsel when he gave a lengthy response that included "Yeah, I'd like to make a statement. * * * I know it's best to have an attorney, you know what I'm saying, but all I'm asking is put me in protective custody and

get me an attorney appointed to me and then I'll make the statement"); *State v. Tefft* (Sept. 2, 1999), 3d Dist. No. 1–99–35, 1999-Ohio-866, 1999 WL 693161, at *3 (defendant never unambiguously and unequivocally requested counsel when he responded to an officer's statement that he had a right to an attorney with "Well I'm going to need one"); *State v. Metz* (Apr. 21, 1998), 4th Dist. No. 96 CA 48, 1998 WL 199944, at *13 (defendant did not assert his right to counsel when he stated, "Maybe I should talk to an attorney"); *State v. Greene* (Dec. 14, 1993), 4th Dist. No. 92 CA 32, 1993 WL 525008, at *2 (defendant did not unambiguously and unequivocally request counsel where he followed the question "Do you want a lawyer present with you right here at this time?" with the response "Well, if you got one available"). With the foregoing law in mind, we turn to the specific issue in this case.

{¶ 20} The question that Raber posed to Detective Chuhi was "[C]an I have an attorney?" The Tenth District dealt with a virtually identical question in *State v. Curtis*, 10th Dist. No. 05AP–795, 2006-Ohio-4230, 2006 WL 2349455. In *Curtis*, police read the defendant, Curtis, his *Miranda* rights and asked if he understood them. He stated that he did. The police then asked, "Do you have any questions about that?" Curtis responded by asking, "Can I get a public defender?" *Curtis* at ¶ 3. An officer told him that he could and that an attorney would be appointed if he could not afford one. The officer then had Curtis read a waiver-of-rights form, asked him to sign the form, and proceeded to conduct an interrogation once he had signed the form. Curtis later moved to suppress the statements he made to officers, arguing that they had obtained his statements unlawfully by disregarding his request for counsel. The Tenth District held that Curtis never invoked his right to counsel. Id. at ¶ 14. Specifically, the court reasoned:

> In the case at bar, defendant did not unambiguously, unequivocally request an attorney. Defendant's question, '[c]an I [get] a public defender?' can be interpreted in two different ways: either defendant was asking whether his rights, as he had just read them, included the right to a public defender or he was asking for access to a public defender. [The officer's] response—that defendant would be entitled to a public defender if he could not afford to hire an attorney—indicates that he believed defendant wanted a clarification of his rights, not that he sought to invoke his right to counsel. Given the ambiguity inherent in defendant's question, we find that a reasonable police officer would come to the same conclusion, and thus, [the officer's] decision to question defendant without counsel present did not violate defendant's right to counsel.

Id. We agree with the Tenth District's analysis.

{¶ 21} Officer Maxwell read Raber her *Miranda* rights when he and Officer Chuhi arrested her. She did not say anything at that point. Officer

Chuhi proceeded to walk her to a police car and she became very emotional. She stopped to sit down on the tire of a boat trailer. As Officer Chuhi went to help her stand up, she asked, "[C]an I have an attorney?" along with multiple questions about what would happen to her children. Given that Raber did not initially offer a response when read her *Miranda* warnings and that she coupled her question about an attorney with questions about her children, it is entirely reasonable that Officer Chuhi thought Raber was asking for clarification about her situation, not asserting her right to counsel. Id.; *Foster* at *9 (defendant who asked, " 'Well, can I have a lawyer present?' * * * did not make a request for counsel; he merely asked if he could have a lawyer present"). As the Eighth Circuit held in a similar situation:

> Considering the question in context, it is not clear that [the defendant] was actually requesting the presence of an attorney when he asked "Could I call my lawyer?" [The defendant] had just asked whether he could contact his girlfriend, and [an officer] had informed him that he could not. [The officer] could have reasonably believed in these circumstances that [the defendant] was merely inquiring whether he had the right to call a lawyer, rather than believing that [the defendant] was actually requesting counsel.

*Dormire v. Wilkinson* (C.A.8, 2001), 249 F.3d 801, 805. A request for the clarification of the right to counsel is not sufficient to invoke the right. Id. Accord *United States v. March* (C.A.10, 1993), 999 F.2d 456, 461 (drawing distinction between questions aimed at invoking the right to counsel versus those aimed at clarifying the right to counsel); *Lord v. Duckworth* (C.A.7, 1994), 29 F.3d 1216, 1220–21 (concluding that a defendant who asked, " 'I can't afford a lawyer but is there anyway I can get one?' * * * most likely was asking for a clarification of his right to counsel at trial" rather than invoking his right to counsel). It is not enough that Raber might have been invoking her right to counsel. *Davis*, 512 U.S. at 459, 114 S.Ct. 2350, 129 L.Ed.2d 362.

{¶ 22} Detective Chuhi could not immediately respond to Raber's question about an attorney when she posed it because he first wanted to address her concerns about her children. Once he did so and gave Raber a few minutes to collect herself, however, he answered her question. He repeated her question back to her and confirmed that she could have an attorney. He asked her if she understood, and she said that she did. He asked her if she understood her *Miranda* rights, and she said that she did. He then asked her if she was willing to speak with him, and she said that she was. "*Miranda* does not require a police officer to ask [a] defendant whether he wants an attorney." *State v. Edwards* (1976), 49 Ohio St.2d 31, 39, 3 O.O.3d 18, 358 N.E.2d 1051, vacated in part on other grounds, *Edwards v. Ohio* (1978), 438 U.S. 911, 98 S.Ct. 3147, 57 L.Ed.2d 1155. Nor has the United States Supreme Court held that an officer

must clarify whether a defendant wants an attorney based on an ambiguous request. *Davis,* 512 U.S. at 459, 114 S.Ct. 2350, 129 L.Ed.2d 362. The Supreme Court has merely recognized that "when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney." Id. at 461, 114 S.Ct. 2350, 129 L.Ed.2d 362. This is because "[c]larifying questions help protect the rights of the suspect by ensuring that he gets an attorney if he wants one, and will minimize the chance of a confession being suppressed due to subsequent judicial second-guessing as to the meaning of the suspect's statement regarding counsel." Id. Here, Detective Chuhi engaged in the "good police practice" of clarifying Raber's rights. See *United States v. Lee* (C.A.7, 2005), 413 F.3d 622, 626 (concluding that police should have stopped interrogating a suspect after he asked, " 'Can I have a lawyer?' * * * *unless* the police obtained further clarification from [him] that this was actually an unequivocal request for an attorney" [emphasis added]). Had Raber wanted an attorney, there was nothing to stop her from specifically asserting her right as she did the next day by saying, "Give me a lawyer." The trial court did not err by concluding that Raber never invoked her right to counsel.

{¶ 23} Because Raber never invoked her right to counsel, we need not address her argument that she never waived her clearly invoked right. Even so, we note that the requirement that police stop questioning a suspect upon his or her assertion of the right to counsel "is 'designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights.' " *Davis,* 512 U.S. at 458, 114 S.Ct. 2350, 129 L.Ed.2d 362, quoting *Michigan v. Harvey* (1990), 494 U.S. 344, 350, 110 S.Ct. 1176, 108 L.Ed.2d 293. The record is devoid of any suggestion of badgering here. Detective Chuhi acted reasonably by clarifying Raber's rights once she asked him a question about counsel. See *Stover,* 9th Dist. No. 96CA006461, 1997 WL 193333, at *3. He did not ask her any questions relevant to the investigation until after he had clarified that she had the right to an attorney and that she understood all of her rights. Further, he never suggested that Raber had to speak with him. He merely asked if she was willing to speak with him.

{¶ 24} As previously noted, Raber does not argue that she did not receive or did not understand her *Miranda* warnings. Detective Chuhi testified that Raber initially appeared to understand her rights when Detective Maxwell first read them. Raber then explicitly agreed that she understood her right to have an attorney and her *Miranda* rights with Detective Chuhi in the police car. Further, Raber does not argue that her confession was involuntary or the product of coercion. Detective Chuhi responded to all of Raber's concerns about her children and gave her time to collect herself. He and Detective Maxwell

interrogated her for less than a two-hour period, during which she confessed, and offered her a drink, a meal, and a bathroom break. Based on all the foregoing, the trial court properly admitted Raber's oral statements. See *Berghuis*, —— U.S. ——, 130 S.Ct. at 2259–2264, 176 L.Ed.2d 1098 (concluding that defendant's statements were properly admitted because there was no indication that he did not understand his rights, defendant's course of conduct indicated that he waived his rights, and there was no evidence that his statement was coerced). Raber's first assignment of error is overruled.

### Assignment of Error Number Two

The trial court erred, or committed plain error, to the prejudice of Barbara Raber, by admitting the testimony about text messages or electronic communications allegedly exchanged between Eli Weaver and Barbara Raber, by admitting the text messages or electronic communications as exhibits, and by not affirmatively demonstrating compliance with the requirements for the admission of such evidence contained in Ohio Revised Code 2933.51 *et seq.*

{¶ 25} In her second assignment of error, Raber argues that the trial court committed plain error by admitting into evidence several text messages that she and Eli Weaver had exchanged around the time of Barbara Weaver's murder.[1] Specifically, she argues that the state did not show that it had obtained the text messages in compliance with the warrant requirements of R.C. 2933.51 et seq. According to Raber, the state needed to obtain an interception warrant for electronic communications in order to properly gain access to her text messages.

{¶ 26} An argument that a court must not consider a piece of evidence because the state obtained it pursuant to an invalid warrant is a suppression-based argument. *State v. Patterson*, 9th Dist. No. 09CA0014–M, 2009-Ohio-6953, 2009 WL 5174079, at ¶ 7–8. Raber never filed a motion to suppress the text messages at issue but argues plain error on appeal. See *State v. Taylor*, 9th Dist. No. 22882, 2006-Ohio-2041, 2006 WL 1085710, at ¶ 17 ("By failing to move to suppress the identification testimony prior to trial or at trial, Appellant has waived all but plain error").

To correct a plain error, all of the following elements must apply: "First, there must be an error, i.e., a deviation from the legal rule. * * * Second, the error must be plain. To be 'plain' within the meaning of Crim.R. 52(B), an error

---

1. Raber's brief also contains an argument that the court erred by allowing testimony about the text messages because they were translated from Amish–Dutch to English, absent an oath from the interpreter that he had made a true translation. Raber has conceded by way of motion, however, that the text messages were actually in English and her assignment of error "should be limited to the compliance with statutory law regarding intercepted communications, pursuant to R.C. 2933.51 *et seq.*"

must be an 'obvious' defect in the trial proceedings. * * * Third, the error must have affected 'substantial rights[ ]' [to the extent that it] * * * affected the outcome of the trial."

*State v. Hardges,* 9th Dist. No. 24175, 2008-Ohio-5567, 2008 WL 4724692, at ¶ 9, quoting *State v. Barnes* (2002), 94 Ohio St.3d 21, 27, 759 N.E.2d 1240. "Courts are to notice plain error 'only to prevent a manifest miscarriage of justice.' " *State v. Payne,* 114 Ohio St.3d 502, 2007-Ohio-4642, 873 N.E.2d 306, at ¶ 16, quoting *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph three of the syllabus.

{¶ 27} Raber's brief largely consists of a series of citations to the section of the Revised Code governing interception warrants and blanket statements concluding that the state did not comply with the listed statutes. Raber does not cite any applicable law in support of her argument that the state had to obtain a warrant pursuant to R.C. 2933.51 et seq. in this matter. App.R. 16(A)(7). Moreover, the warrant the state relied upon to procure the text messages in this case is not even a part of the record on appeal because Raber never challenged it at the trial level. Id. See also *State v. Moore,* 9th Dist. No. 24126, 2008-Ohio-3955, 2008 WL 3009839, at ¶ 11 (presuming regularity in appeal challenging content of warrant because the affidavit in support of the warrant was not a part of the record on appeal). The sole case that Raber relies upon in support of her argument is *State v. Bidinost* (1994), 71 Ohio St.3d 449, 644 N.E.2d 318. In *Bidinost,* police officers instructed a third party to record a conversation between two individuals, who were speaking on cordless phones and whose conversation was audible via the third party's baby monitor. The Supreme Court held that the trial court erred by not suppressing the recorded conversation because R.C. 2933.51 et seq. prohibits police who have not first obtained an interception warrant from intercepting an ongoing communication (e.g., a phone conversation) through the use of an interception device (e.g., a baby monitor). *Bidinost,* 71 Ohio St.3d at 460–461, 644 N.E.2d 318.

{¶ 28} *Bidinost* is distinguishable from the case at hand. Here, the state did not seize an ongoing communication. The state obtained the text messages between Raber and Eli Weaver after the fact. Moreover, the state did not have to rely upon a third party to introduce this evidence. Even assuming that R.C. 2933.51 et seq. applies to electronic communications that are not ongoing, Eli Weaver testified at trial as to the content of the text messages at issue. R.C. 2933.52, the code section prohibiting the interception of an electronic communication absent an interception warrant, does not apply to "[a] person who is not a law enforcement officer and who intercepts a[n] * * * electronic communication, if the person is a party to the communication." R.C. 2933.52(B)(4). See also *State v. Bell,* 12th Dist. No. CA2008–05–044, 2009-Ohio-2335, 2009 WL 1395857, at

¶ 40–42 (admitting taped conversations did not violate R.C. 2933.52 because one of the parties to the conversation cooperated with police to obtain the content of the conversation). Raber has not pointed this court to any law that would have prohibited Eli Weaver, a party to the communications with Raber, from divulging the content of their communications.

{¶ 29} Based on all the foregoing, Raber's assertion that the court committed plain error by admitting text messages between her and Eli Weaver lacks merit.

Assignment of Error Number Three

The trial court committed plain error by admitting evidence of digitally stored information and other electronic communications taken from computers.

{¶ 30} In her third assignment of error, Raber argues that the court committed plain error by admitting into evidence testimony about digitally stored information recovered from her computers. Raber relies upon the argument she set forth in her second assignment of error and avers that the state violated R.C. 2933.51 et seq. by not obtaining an interception warrant before searching her computer. Raber asserts, without any legal support, that "digitally-stored information from a computer search fits the definition of an 'electronic communication.' " Further, she does not set forth any law or argument explaining how she believes that the state "intercepted" her digitally stored information or what "interception device" she believes the state used to obtain the information. An appellant bears the burden of setting forth an argument on appeal and pointing this court to applicable, legal authority in support of that argument as well as to the relevant portions of the record. App.R. 16(A)(7). "As we have repeatedly held, '[i]f an argument exists that can support [an] assignment of error, it is not this [c]ourt's duty to root it out.' " *NSK Industries, Inc. v. Bayloff Stamped Prods. Kinsman, Inc.*, 9th Dist. No. 24777, 2010-Ohio-1171, 2010 WL 1052261, at ¶ 20, quoting *Cardone v. Cardone*, (May 6, 1998), 9th Dist. No. 18349, 1998 WL 224934, at *8. Raber has failed to carry her burden on appeal with regard to her third assignment of error. Therefore, it is overruled.

Assignment of Error Number Four

The conviction was against the manifest weight of the evidence.

{¶ 31} In her fourth assignment of error, Raber argues that her conviction is against the manifest weight of the evidence. We disagree.

{¶ 32} In determining whether a conviction is against the manifest weight of the evidence, an appellate court "must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact

clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Otten* (1986), 33 Ohio App.3d 339, 340, 515 N.E.2d 1009. A weight-of-the-evidence challenge indicates that a greater amount of credible evidence supports one side of the issue than supports the other. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541. Further, when reversing a conviction on the basis that the conviction was against the manifest weight of the evidence, the appellate court sits as the "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony. Id. Therefore, this court's "discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717; see also *Otten,* 33 Ohio App.3d at 340, 515 N.E.2d 1009.

{¶ 33} R.C. 2903.01(A) provides that "[n]o person shall purposely, and with prior calculation and design, cause the death of another."

A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature.

R.C. 2901.22(A). Whoever commits the foregoing act is guilty of aggravated murder. R.C. 2903.01(F).

{¶ 34} Eli Weaver testified against Raber at her trial as a result of his plea agreement with the state. Eli admitted that he had multiple affairs during his marriage and "just didn't love [his] wife the way [he] should have loved her." He left his Amish faith and home more than once because he wanted "more freedom" but was welcomed back each time. Eli recalled that he began a relationship with Raber about six years before his wife's murder. According to Eli, once he mentioned wanting to be rid of his wife to Raber, Raber "ran with [the idea]" and repeatedly suggested poisoning Weaver. Eli testified that he considered ingesting poison along with his wife so as to commit suicide. He accepted "poison pills" from Raber about two to three weeks before Barbara Weaver's actual death but did not go through with the poisoning. Raber also suggested that Weaver be suffocated or murdered with a firearm.

{¶ 35} Eli testified to the content of the text messages that he and Raber exchanged about Barbara Weaver's murder. Eli planned on going on a fishing trip to Lake Erie with several of his friends on June 2, 2009. When he told Raber of his planned trip, she sent him a text message asking him what time he was leaving and stating that June 2 "would be a good day to do it" because Eli would not be at home. Eli responded by text that he would leave his basement door open when he left. The next day, June 2, 2009, Eli left his home for his

fishing trip shortly after 3:00 a.m. He testified that he left the bottom basement door unlocked and sent Raber a text message on the way to Lake Erie. Raber sent Eli several text messages expressing her concern that she would not be able to follow through. Specifically, at 3:03 a.m., Raber asked Eli how she was supposed to see in the dark and commented that "[i]t's too scary." Eli responded by text message at 3:20 a.m., telling Raber to take a light. Eli received additional text messages at 3:25 a.m. and 3:26 a.m. from Raber, who told him that she was "so scared" and asked where he was. Eli responded that he was in Wooster and advised Raber not to leave anything behind. Raber sent another text message at 3:29 a.m. asking if she could "drive in behind the pines."

{¶ 36} Eli testified that he received a phone call at about 6:00 a.m. from Firman Yoder, a neighbor who lived behind the Weavers' home. Yoder indicated that Barbara Weaver was "not responding," and Eli left for home. Eli met with Detective Chuhi when he got back to town and gave a statement. Eli denied any involvement in his wife's death but mentioned that he was having a sexual relationship with Raber. After speaking with Detective Chuhi, Eli remained at home the rest of the day. He testified that he received a text message from Raber at 2:46 p.m. that said, "[W]hatever you do don't give your cell phone, please." He later received another text message from Raber, asking if they could change phone numbers so that their phones could not be traced. Raber, who had given Eli his cell phone as a part of her phone plan, later changed Eli's cell phone number.

{¶ 37} Eli testified that Raber came to his barn about one week later and the two discussed his wife's murder. Raber told Eli that she was "sorry for everything" and explained how she had gone into his house and Eli's bedroom. Additionally, she asked Eli about how to clean a gun so that it might appear that the gun had not been used. She also asked Eli what to say if her husband noticed that their .410–gauge shotgun was missing.

{¶ 38} Linda and Firman Yoder testified that they lived behind the Weavers' home in a house that was attached to a gun shop that Eli owned and operated. Outside of the shop, a small shanty contained a phone equipped with voicemail. Linda Yoder testified that she checked the voicemails on the shanty's phone on June 3, 2009. One voicemail, from an unidentified male, stated, "Eli, you can run but you can't hide. Obviously we got the wrong person last night." Police later identified the male caller as David Weaver, a friend of Raber's family. David Weaver testified at trial that Raber called him shortly after Barbara Weaver's murder and asked him to leave the message on the shanty's phone. He also testified that he loaned Raber his .410–gauge shotgun four to five years before Barbara Weaver's murder, but Raber never returned it.

{¶ 39} Dr. Amy Joliff, the Wayne County coroner, testified that she arrived at Barbara Weaver's home at about 11:30 a.m. on June 2, 2009. She observed a single gunshot wound to Weaver's chest but did not observe any stippling. Dr. Joliff testified that stippling would indicate that the gunshot was discharged from a further distance and that a lack of stippling would be consistent with a gunshot wound received at close range. Dr. Joliff recorded Weaver's time of death as 2:00 a.m. on Weaver's death certificate but stated that Weaver died anywhere from 12:00 a.m. to 6:00 a.m. She explained that time-of-death estimations are inexact and that she only recorded Weaver's time of death as 2:00 a.m. because death certificates require the recording of a specific time.

{¶ 40} Dr. Lisa Kohler, the Summit County chief medical examiner, performed the autopsy on Barbara Weaver's body. She concluded that Weaver died as the result of a single gunshot wound to the right side of her chest. Dr. Kohler found shotgun pellets inside Weaver's body, but not any type of wadding, cork, or shot cup. She explained that when a person is shot from a very close distance with a shotgun, the latter items are generally found in the person's body along with the shotgun pellets. Dr. Kohler opined, however, that it would be possible to fire a shotgun at close range and leave only pellets behind if the shot passed though another substance before entering the body. She opined that such a wound might occur if a shotgun was fired through a bedspread or comforter. Dr. Kohler agreed with Dr. Joliff's assertion that arriving at a time of death is "not an exact science."

{¶ 41} John Gardner, a firearms examiner for the Ohio Bureau of Criminal Identification and Investigation, testified that he examined the shotgun pellets extracted from Barbara Weaver's body as well as her bedspread. He testified that he determined that the pellets were "[n]umber six shot," a common type of shot used in at least four different gauges of shotguns. Gardner also testified, however, that Weaver's bedspread contained two holes that he was able to measure and use to determine the size of the projectiles that passed through it. Gardner concluded, based on the measurements he made, that either a .410–gauge or .410–bore shotgun was used to kill Barbara Weaver.

{¶ 42} Detective Maxwell of the Wayne County Sheriff's Office testified that he went with Detective Chuhi to arrest Raber on June 10, 2009, and also searched the Weavers' home as part of the investigation. Detective Maxwell testified that police found money on the kitchen counter at the Weaver home, which he indicated would be unlikely if a robbery had occurred. He also indicated that the police collected two .410–gauge shotguns from Eli's gun shop as well as a box of .410 slugs with one slug missing. Detective Maxwell testified that when he and Detective Chuhi interviewed Raber, she admitted to sending texts to Eli but claimed that she only meant them as a joke and wanted to see how far he would

let the joke go. Later during the same interview, however, Raber began crying and informed the detectives that "it was an accident." She described to the detectives how she drove to Barbara Weaver's home on the morning of June 2, 2009, and went through the unlocked bottom door. Raber claimed that she only went there to scare Weaver, but "the gun went off" when she was standing in the bedroom doorway. She could not remember what type of gun she had with her, but she told the detectives that she had placed the gun in her husband's gun cabinet when she got back home. Raber insisted that "it was all Eli's idea" and that he repeatedly begged her to kill his wife. Detective Maxwell testified that he and Detective Chuhi went to speak with Raber again the next day because they did not believe she was being entirely truthful and several of her statements did not match the facts the police had uncovered. For example, the police did not find a .410–gauge shotgun in the Raber home and knew, based on the type of wound Barbara Weaver had received, that Raber would not have been able to accidentally shoot her from a distance. When the detectives began to ask Raber about the details of her oral statement, however, she asserted her right to counsel and ended the interview. Detective Maxwell testified that he believed that Raber was trying to minimize her involvement by misconstruing the facts to make the shooting sound accidental.

{¶ 43} Detective Chuhi testified that he initially met Raber on June 3, 2009, as a result of Eli's statement that he and Raber were having an affair. Raber denied having any information about Barbara Weaver's murder when Detective Chuhi first spoke with her, and she gave a written statement to that effect. Only after the detectives had arrested Raber and began discussing the text messages she had exchanged with Eli did she admit to murdering Weaver. Detective Chuhi confirmed Detective Maxwell's testimony that Raber said the murder was Eli's idea and that it was an accident.

{¶ 44} Dena Unangst, Raber's cellmate at the Wayne County Jail, also testified against her. Unangst testified that Raber told her she had purchased a .410–gauge shotgun and made several statements about Eli, indicating that he wanted to kill his wife. Unangst further testified that Raber asked her how long fingerprints would remain on a gun.

{¶ 45} Several other pieces of evidence also emerged at trial. In addition to the .410–gauge shotgun that Raber had borrowed from David Weaver, Larry Miller testified that Raber purchased a .410–gauge shotgun from his gun supply store on November 15, 2008. Accordingly, Raber had access to two different .410–gauge shotguns, the type of weapon used to kill Barbara Weaver. Officers also found a notebook from Raber's home with several types of poisons written down inside it. Finally, Raber had several discussions with her husband over the jail phone during her stay in the Wayne County Jail. Raber admitted to her

husband that she had sent text messages to Eli about "that stuff" but insisted that her text messages were just meant to lead on Eli and see how far he would go.

{¶ 46} Based on all the foregoing, we must conclude that Raber's conviction is not against the manifest weight of the evidence. Raber had access to two different .410–gauge shotguns, the type of murder weapon that killed Barbara Weaver. She confessed to killing Weaver with a gun, which the forensic evidence revealed was fired at close range. Moreover, Raber exchanged text messages with Eli both directly before and after Barbara Weaver's murder, placing herself at the scene. According to the estimated time of death, Raber had the opportunity to kill Weaver after Eli left for his fishing trip. She sought to create confusion surrounding the murder by asking a friend to leave a message, making it sound as if people had shot Weaver when trying to kill Eli. Further, she gave the police inconsistent statements, initially denying any involvement and then later claiming Weaver's death was accidental. Weaver's argument that her conviction is against the manifest weight of the evidence lacks merit. Her fourth assignment of error is overruled.

### III

{¶ 47} Raber's assignments of error are overruled. The judgment of the Wayne County Court of Common Pleas is affirmed.

Judgment affirmed.

BAIRD, J., concurs.

BELFANCE, P.J., concurs in judgment only.

BAIRD, J., of the Ninth District Court of Appeals, sitting by assignment.

BELFANCE, Presiding Judge, concurring in judgment only.

{¶ 48} I concur in the judgment of the majority. I agree that Raber's first assignment of error is properly overruled, however, I do so on a different basis.

{¶ 49} It is well settled that "law enforcement officers must immediately cease questioning a suspect who has clearly asserted his right to have counsel present during custodial interrogation." *Davis v. United States* (1994), 512 U.S. 452, 454, 114 S.Ct. 2350, 129 L.Ed.2d 362, citing *Edwards v. Arizona* (1981), 451 U.S. 477, 484–485, 101 S.Ct. 1880, 68 L.Ed.2d 378. "The applicability of the ' "rigid prophylactic rule" ' of *Edwards* requires courts to 'determine whether the accused *actually invoked* his right to counsel.' " (Emphasis sic.) *Davis*, 512 U.S. at 458, 114 S.Ct. 2350, 129 L.Ed.2d 362, quoting *Smith v. Illinois* (1984), 469 U.S. 91, 95, 105 S.Ct. 490, 83 L.Ed.2d 488. In order to invoke the right, "the suspect

must unambiguously request counsel." Id. at 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 "[A]n accused * * * having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards*, 451 U.S. at 484–485, 101 S.Ct. 1880, 68 L.Ed.2d 378.

{¶ 50} Based upon the facts of the instant case, I would conclude that Raber clearly and unambiguously invoked her right to counsel when she said, "Can I have an attorney?" As a result, the police were required to stop all questioning. See id. It is troubling that upon Raber's asserting her right to counsel, the police neglected to follow their own protocol, which required the police to inform Raber how and when a lawyer would be provided.

{¶ 51} Statements strikingly similar to Raber's have been held to constitute invocations of the right to an attorney. For example, in *United States v. Lee* (C.A.7, 2005), 413 F.3d 622, the Seventh Circuit Court of Appeals concluded that the question "Can I have a lawyer?" was an invocation of the right to counsel. Id. at 626. In so doing, the *Lee* court examined one of its prior decisions, *Lord v. Duckworth* (C.A.7, 1994), 29 F.3d 1216, 1221, in which it "mentioned several requests for counsel that it considered unequivocal: 'I think I should call my lawyer'; 'I have to get me a good lawyer, man. Can I make a phone call?'; 'Can I talk to a lawyer? At this point, I think maybe you're looking at me as a suspect, and I should talk to a lawyer. Are you looking at me as a suspect?'" (Citations omitted.) *Lee*, 413 F.3d at 626, quoting *Lord*, 29 F.3d at 1221. The *Lee* court determined that the statement at issue was similar enough to the other statements so as to constitute an invocation of the right to counsel. *Lee*, 413 F.3d at 626. Other courts have concluded likewise. See also *Kyger v. Carlton* (C.A.6, 1998), 146 F.3d 374, 379 ("Kyger's statement on November 14th—that he would 'just as soon have an attorney'—was a request for counsel. The continuation of questioning after he did so was a violation of his rights, and the admission of his statements from that interrogation was unconstitutional"); *United States v. Smith* (Feb. 15, 2008), S.D. No. CR. 07–30097, at ¶ 12 (the question "Can I get a lawyer here?" was held to be "a sufficiently clear and unequivocal request to invoke [the] *Miranda* right to counsel and have questioning cease").

{¶ 52} Thus, because Raber invoked her right to counsel, it is necessary to examine whether Raber waived her right to counsel. See *Smith v. Illinois* (1984), 469 U.S. 91, 95, 105 S.Ct. 490, 83 L.Ed.2d 488. However, even if Raber did not validly waive her right to counsel after invoking it, I would nevertheless conclude that her assignment of error should be overruled, because any error in admitting Raber's statement was harmless. The Supreme Court of Ohio has repeatedly held that "[b]efore constitutional error can be considered harmless, we

must be able to 'declare a belief that it was harmless beyond a reasonable doubt.' *Chapman v. California* (1967), 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705. Where there is no reasonable possibility that unlawful testimony contributed to a conviction, the error is harmless and therefore will not be grounds for reversal." *State v. Brown* (1992), 65 Ohio St.3d 483, 485, 605 N.E.2d 46; see also *State v. Rahman* (1986), 23 Ohio St.3d 146, 151, 23 OBR 315, 492 N.E.2d 401, quoting *State v. Bayless* (1976), 48 Ohio St.2d 73, 106, 2 O.O.3d 249, 357 N.E.2d 1035.

{¶ 53} Here, after Raber invoked her right to counsel, Raber "stated that she did it and that it was an accident." While this statement is certainly damaging to Raber, the state presented overwhelming evidence of Raber's guilt. While the breadth of the state's evidence against Raber is detailed in the main opinion's manifest-weight analysis, I think it important to reiterate a few salient pieces of evidence that were presented by the state. First, Eli Weaver testified against Raber, noting that after he spoke of wanting to be rid of his wife, Raber brought up poisoning his wife, suffocating her, or killing her with a firearm. Raber's computer evidenced searches for various ways to kill a person. Moreover, Eli Weaver explained the rather detailed text messages he and Raber sent that clearly showed Raber's plan to murder Eli Weaver's wife. These included a text message in which Raber suggested that June 2 "would be a good day to do it," and multiple messages shortly before and after the murder. After the murder, Eli Weaver received a text message from Raber asking that he not give up the cell phone, showing her awareness of its damaging content. There was evidence presented that Raber had access to two weapons of the same type as the one that killed Eli Weaver's wife. After the murder, Raber sent a text message to Eli Weaver asking him how to clean a gun so that it would not appear that it had been fired and asking him what Raber should tell her husband if he discovered that the .410–gauge shotgun was missing. Thus, in light of all the evidence presented by the state that supported Raber's conviction, it is reasonable to conclude that the improper admission of her statement was harmless error. Therefore, I concur in the judgment of the majority.