[Cite as *State v. Huguley*, 2017-Ohio-8300.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | C.A. No. 28322 |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| MICHAEL L. HUGULEY | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No. CR 2015 08 2362 |

DECISION AND JOURNAL ENTRY

Dated: October 25, 2017

CALLAHAN, Judge.

{¶1} Michael Huguley appeals from his murder conviction in the Summit County Court of Common Pleas. This Court affirms.

I.

{¶2} Mr. Huguley and Jasmine Williams had been in a romantic relationship, lived in an apartment together, and had a child together. Ms. Williams spent the day and night of June 22, 2015 with a friend and co-worker, D.D. When the two returned the next morning, Mr. Huguley was packing up the belongings in the apartment. D.D. and Ms. Williams were scheduled to work that night, so D.D. planned to stay at the apartment as she often did.

{¶3} Mr. Huguley and Ms. Williams began to argue. After that, Mr. Huguley's and D.D.'s stories diverge as to exactly what transpired. They do, however, agree that Mr. Huguley stabbed Ms. Williams, stabbed himself, and fled the apartment. Mr. Huguley claims that Ms.

Williams stabbed him first and that he acted in self-defense. Ms. Williams died as a result of her stab wounds.

{¶4} Mr. Huguley was apprehended five weeks later. He was indicted for one count of aggravated murder, two counts of murder, two counts of felonious assault, and one count of domestic violence. Following a jury trial, Mr. Huguley was acquitted of aggravated murder and found guilty of the remaining counts. The trial court merged the offenses, and sentenced Mr. Huguley to a term of 15 years to life for murder.

{¶5} Mr. Huguley appeals raising four assignments of error.

II.

**ASSIGNMENT OF ERROR NO. 1**

THE TRIAL COURT ERRED BY DENYING DEFENDANT'S MOTION TO SUPPRESS AS THE APPELLANT INVOKED HIS RIGHT TO COUNSEL BEFORE GIVING A STATEMENT TO POLICE[.]

{¶6} In his first assignment of error, Mr. Huguley argues that the trial court erred in denying his motion to suppress because, after he was in police custody, he requested and was denied counsel. This Court disagrees.

{¶7} "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. The trial court, as the trier of fact, is in the best position to judge the credibility of witnesses and resolve factual issues. *Id*. An appellate court, therefore, "must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Id*. "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id*.

**{¶8}** In the present case, Mr. Huguley does not challenge the trial court's factual findings. His challenge is limited to the court's legal conclusion that he did not invoke his right to counsel. Therefore, this Court conducts a de novo review. *See State v. Raber*, 189 Ohio App.3d 396, 2010-Ohio-4066, ¶ 9 (9th Dist.) (legal conclusions in ruling on a motion to suppress are reviewed de novo).

**{¶9}** When a suspect in a criminal investigation requests counsel, police questioning must cease until a lawyer is provided or the suspect reinitiates the interrogation. *State v. Henness*, 79 Ohio St.3d 53, 63 (1997). "But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, [Supreme Court] precedents do not require the cessation of questioning." (Emphasis sic.) *Davis v. United States*, 512 U.S. 452, 459 (1994). Courts have found that a suspect asking questions about counsel does not amount to an unequivocal request for counsel. *See Raber* at ¶ 19 (collecting cases). Similarly, "[an] appellant's equivocal statement, 'I think I need a lawyer, 'cause I don't know what you're talking about DNA,' does not amount to an invocation of counsel." *State v. Wellman*, 10th Dist. Franklin No. 05AP-386, 2006-Ohio-3808, ¶ 26.

**{¶10}** In the present case, Mr. Huguley was arrested and taken to an interview room in the Akron Police Department. Detective Bell asked him if he knew why he was there and then proceeded to open an envelope containing a kit for collecting a DNA sample. Detective Bell presented Mr. Huguley with a voluntary consent form for the sample. Mr. Huguley responded, "Can I deny this until I see my lawyer?" Detective Bell then indicated that Mr. Huguley's DNA might already be in the system or they could get a search warrant for it. After that, Mr. Huguley signed the consent form. On cross-examination, Detective Bell agreed that Mr. Huguley was in

custody and "[t]he word 'lawyer' c[a]me[] out of his mouth." From this, Mr. Huguley appears to conclude that he invoked his right to counsel.

{¶11} The mere use of the word "lawyer" does not amount to an unambiguous request for counsel. *See Raber* at ¶ 19 (listing various statements or questions containing the word "lawyer" or "attorney" that have been held not to amount to an unambiguous or unequivocal request for counsel).

{¶12} The trial court correctly found that Mr. Huguley "did not make an unambiguous or unequivocal request for counsel." Rather, he "merely inquired if he could defer consent to the DNA collection until after he spoke to an attorney." Mr. Huguley's question was insufficient to invoke his right to counsel. Consequently, the trial court did not err denying his motion to suppress.

{¶13} Mr. Huguley's first assignment of error is overruled.

## ASSIGNMENT OF ERROR NO. 2

THE TRIAL COURT ABUSED ITS DISCRETION BY DENYING DEFENDANT'S MOTION FOR MISTRIAL AS A RESULT OF THE STATE'S DISCOVERY VIOLATION[.]

{¶14} In his second assignment of error, Mr. Huguley argues that he should have been granted a mistrial following an inadvertent discovery violation by the State. This Court disagrees.

{¶15} "[A] trial court has discretion in determining a sanction for a discovery violation." *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, ¶ 33. This Court, therefore, reviews the trial court's decision in that regard for an abuse of discretion. *State v. Alesci*, 9th Dist. Summit No. 27615, 2016-Ohio-90, ¶ 5. An abuse of discretion occurs if the trial court acted in a manner

that was arbitrary, unreasonable, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

**{¶16}** Criminal Rule 16 governs discovery in a criminal case. The purpose of the discovery rule is "to provide all parties in a criminal case with the information necessary for a full and fair adjudication of the facts, to protect the integrity of the judicial system and the rights of defendants, and to protect the well-being of witnesses, victims, and society at large." Crim.R. 16(A). The rule aims "'to prevent surprise and the secreting of evidence favorable to one party.'" *Darmond* at ¶ 19, quoting *Lakewood v. Papadelis*, 32 Ohio St.3d 1, 3 (1987).

**{¶17}** If a party fails to comply with the rule, "the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other orders it deems just under the circumstances." Crim.R. 16(L)(1). A mistrial is a severe sanction used in those cases where "'a fair trial is no longer possible.'" *State v. Smith*, 9th Dist. Summit No. 25518, 2011-Ohio-2886, ¶ 7, quoting *State v. Franklin*, 62 Ohio St.3d 118, 127 (1991).

**{¶18}** When faced with a discovery rule violation, a trial court must inquire into the circumstances giving rise to the violation and impose the least severe sanction consistent with the purpose of the discovery rule. *Papadelis*, 32 Ohio St.3d 1, at paragraph two of the syllabus. When determining the appropriate sanction, a trial court should consider the following three factors: "(1) whether the failure to disclose was a willful violation of Crim.R. 16, (2) whether foreknowledge of the undisclosed material would have benefited the accused in the preparation of a defense, and (3) whether the accused was prejudiced." *Darmond* at ¶ 35.

**{¶19}** On the second day of trial in the instant matter, the State provided the defense with a disc of information that had been extracted from the victim's phone. The State explained

that the phone had been sent to the Ohio Bureau of Criminal Investigation ("BCI") the year before. BCI had initially reported that they were unable to retrieve the information on the phone, but they referenced a chip that could be removed. The assistant prosecutor was not aware that any additional analysis had been conducted.

{¶20} The detective who had been handling that aspect of the case retired, and there was no notation indicating that an additional analysis was being conducted. The week before the trial started, an officer who was transporting items from BCI to the police department was given the disc with the extracted information. That officer placed the disc in the mailbox of the detective who had replaced the one who retired. That detective was on vacation at the time. Upon his return from vacation, he discovered the disc and the assistant prosecutor was notified. The assistant prosecutor immediately copied the disc, provided the copy to defense counsel, and informed the trial court of the situation.

{¶21} At that point, neither side had reviewed the information on the disc. The trial court postponed the testimony of D.D., and noted that they were not scheduled to be in court the following day, thus, providing the parties an opportunity to review the disc. Defense counsel moved for a mistrial arguing there might be exculpatory evidence on the disc. The trial court denied the motion.

{¶22} When the matter reconvened, the parties had gone through some, but not all, of the information contained on the disc. Defense counsel suggested that neither side should be able to use the contents of the disc. The State agreed not to use it in its case in chief, but requested to be able to use it in cross-examination and rebuttal if necessary. Defense counsel again requested a mistrial. The State suggested that the testimony of certain witnesses, who the

parties agreed the information on the disc did not concern, go forward and then, that the parties be given the weekend to further review the contents of the disc.

**{¶23}** The Court found, and the defense does not dispute, that the violation in this case was not willful or in bad faith. The Court further found that there was a sanction "less drastic than dismissal [that] will ensure that the defendant is fairly tried." The Court concluded that "the appropriate remedy [was] a continuance of a day or two before the phone could be used." That ruling was made on a Thursday, two witnesses testified that day, no proceedings were had on Friday, and the matter proceeded again on Monday. Defense counsel renewed its motion for mistrial, but it was again denied.

**{¶24}** Upon review, this Court concludes that the trial court did not abuse its discretion. Pursuant to *Papadelis*, a trial court is to "impose the least severe sanction that is consistent with the purpose of the rules of discovery." 32 Ohio St.3d 1, at paragraph two of the syllabus. Upon learning of the disc, the State promptly made it available to the defense. The trial court then provided for a continuance and reordering of witnesses in order that the information on the disc could be reviewed, and thereby allowing the parties an opportunity to further prepare in light of the information contained on the disc. Finally, Mr. Huguley has not argued, much less demonstrated, how he was prejudiced by the trial court's decision to grant a continuance rather than a mistrial.

**{¶25}** Mr. Huguley's second assignment of error is overruled.

### ASSIGNMENT OF ERROR NO. 3

THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT FAILED TO DECLARE A MISTRIAL FOR JUROR MISCONDUCT[.]

**{¶26}** In his third assignment of error, Mr. Huguley argues that the trial court erred by not removing the jury foreperson or declaring a mistrial. Although Mr. Huguley recognizes that

his trial counsel did not request this relief and made the "tactical decision" to proceed, he contends that the failure to remove the juror or declare a mistrial rises to the level of plain error.

{¶27} The distinction between a waiver of an objection and the forfeiture of an objection prevents this Court from applying a plain error analysis in this case. *See State v. Fitzgerald*, 9th Dist. Summit No. 23072, 2007-Ohio-701, ¶ 8. "Although the terms are frequently used interchangeably, a waiver occurs where a party affirmatively relinquishes a right or an objection at trial; a forfeiture occurs where a party fails to assert a right or make an objection before the trial court in a timely fashion." *Id.*, citing *State v. Hairston*, 9th Dist. Lorain No. 05CA008768, 2006-Ohio-4925, ¶ 9, quoting *United States v. Olano*, 507 U.S. 725, 733 (1993). An objection that has been forfeited may be assigned as error on appeal if a showing of plain error is made. *Fitzgerald* at ¶ 8. "Where a party has affirmatively waived an objection, however, the error may not be asserted on appeal even if it does amount to plain error." *Id.*

{¶28} In the present case, the jury foreperson researched his duties by looking up the definition of a "jury foreman." He brought notes regarding his thoughts and the definition with him and planned to use them in the jury room. Upon learning of this, the trial court questioned the juror and allowed the assistant prosecutor and defense counsel to question the juror. The trial court took the juror's notes from him. "[B]ased on his answers to the questions," the State did not object to him continuing as a juror. One attorney for the defendant stated that "[he] would have to agree with the State." The other attorney for the defendant stated, "if the State is not finding a problem, the defense is not finding it a problem." He concluded that he had "assess[ed] [the foreperson] [and] listen[ed] to his explanation" and made the "tactical decision [ ] to leave him on [the jury.]" He further explained, "it's a proper decision for Mr. Huguley to have this

jury render its verdict" and "tactically it would probably be to the State's advantage to be in retrial."

{¶29} Consequently, Mr. Huguley did not forfeit this alleged error by failing to object. Rather, he waived any objection by making the "tactical decision" to proceed with the jury that was in place. *See Fitzgerald* at ¶ 11. "Because the [alleged] error was affirmatively waived at the trial level, it may not be raised on appeal even if it was plain error." *Id*.

{¶30} Mr. Huguley's third assignment of error is overruled.

**ASSIGNMENT OF ERROR NO. 4**

THE VERDICT OF THE TRIAL COURT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AS THE DEFENSE PROVED THE AFFIRMATIVE DEFENSE OF SELF DEFENSE BY A PREPONDERANCE OF THE EVIDENCE[.]

{¶31} In his fourth assignment of error, Mr. Huguley argues that the jury lost it way in convicting him of murder because he claims the evidence weighs in favor of a finding of self-defense. This Court disagrees.

{¶32} A manifest weight of the evidence challenge addresses whether the greater amount of credible evidence supports one side over the other. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). When an appellant brings a manifest weight of the evidence challenge,

> an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). In conducting such a review, the appellate court essentially acts as a "'thirteenth juror.'" *Thompkins* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). An appellate court's grant of a new trial on manifest weight of

the evidence grounds is reserved for "exceptional cases where the evidence weighs heavily against the conviction." *Otten* at 340.

{¶33} This Court notes that the parties focus on the testimony of Mr. Huguley and D.D. Nonetheless, because Mr. Huguley has brought a manifest weight challenge, this Court is obligated to review the entire record. *See Otten* at 340. This Court has conducted that review, but limits its discussion to the testimony and evidence that pertains to Mr. Huguley's claim of self-defense.

{¶34} To establish self-defense when deadly force has been used,

> the following elements must be shown: (1) the slayer was not at fault in creating the situation giving rise to the affray; (2) the slayer has a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) the slayer must not have violated any duty to retreat or avoid the danger.

*State v. Robbins*, 58 Ohio St.2d 74 (1979), paragraph two of the syllabus. These elements are cumulative, such that "[i]f the defendant fails to prove *any one* of these elements by a preponderance of the evidence he has failed to demonstrate that he acted in self-defense." (Emphasis sic.) *State v. Jackson*, 22 Ohio St.3d 281, 284 (1986).

{¶35} When considering the bona fide belief prong, "the jury must consider all the circumstances to see whether the defendant had an objective reasonable belief of imminent danger and if he possessed a subjective honest belief that he was in danger of imminent harm." *State v. Inman*, 9th Dist. Medina No. 03CA0099-M, 2004-Ohio-1420, ¶ 9. The privilege to defend oneself is limited to "that force which is reasonably necessary to repel the attack." *State v. Williford*, 49 Ohio St.3d 247, 249 (1990).

{¶36} In the present case, there was conflicting evidence about who was the initial aggressor and whether Mr. Huguley had a bona fide belief that he was in such imminent danger that his only means of escape was the use of deadly force.

{¶37} Mr. Huguley testified that Ms. Williams came home about 9:00 a.m. on June 23, 2015. At that time, he was packing up their belongings and she became upset. During the ensuing argument, he ran out to her car to look for a cell phone, but he did not find it there. Ms. Williams also ran out to the car. According to Mr. Huguley, when they returned to the apartment, Ms. Williams went to the bedroom and he went to the kitchen. He testified that, as he was getting a beer out of the refrigerator, he "felt a sharp pinch to [his] back and neck area." When he turned around, Ms. Williams stabbed him in the chest. He "believe[d] she was trying to hurt [him] pretty bad." Mr. Huguley testified that he "grabbed her neck and * * * arm," "[p]ush[ed] her back," and "pulled [the knife] out of her hands." He further testified that after he "grabbed the knife, then [he] stabbed her." He then stabbed himself in the neck and fled the scene.

{¶38} Mr. Huguley admitted that the knife was his, but believed that Ms. Williams had retrieved it from her car. He explained that, approximately one month earlier, Ms. Williams had removed all the knives from the apartment because he "told her [that he was] going to cut [him]self again." He further explained that he had a prior history of cutting himself when he was depressed and that Ms. Williams was aware of that history. Although Mr. Huguley admitted that he managed to disarm Ms. Williams, he felt she was still "[a] threat" even after he had the knife. He explained that she was fighting with him and she was strong.

{¶39} According to Mr. Huguley, D.D. was outside when the stabbing started. He could not remember if she got involved later or if he had done anything to her.

{¶40} By contrast, D.D. testified that she was in the living room. She heard Mr. Huguley and Ms. Williams arguing in the bathroom and bedroom. She testified that Mr. Huguley and Ms. Williams ran out of the apartment to Ms. Williams' car. They continued to argue when they returned to the apartment. She saw Mr. Huguley pull a long, folding type knife from his pocket and start stabbing Ms. Williams. D.D. testified that she tried to help Ms. Williams, but Mr. Huguley pushed her and she ended up hitting the door. She stated that Mr. Huguley stabbed himself in the neck, stabbed Ms. Williams some more, and fled the scene.

{¶41} Dr. Dorothy Dean performed Ms. Williams' autopsy. She testified that Ms. Williams' death was caused by multiple stab wounds to her chest, which penetrated her lungs and heart. Dr. Dean also noted minor injuries to Ms. Williams' hands, a stab wound on her back near her left shoulder and one to her right thigh. She explained that it was not unusual for a stabbing victim to have injuries to the hands because "a lot of times people fighting for their life get injuries to their hands." She further testified that the bone and cartilage of one of Ms. Williams' ribs was injured. When discussing that injury, she stated that "it takes a lot of force to break the skin and bone."

{¶42} According to the autopsy report, Ms. Williams was 5'6" tall and weighed 167 pounds. In comparison, Mr. Huguley testified that he was 6'7" tall and weighed 250 pounds.

{¶43} Sergeant John Mostar testified that he took pictures of Mr. Huguley on the day he was arrested. The pictures show "scarring" or "markings" on Mr. Huguley's arms, hands, chest, and the front and sides of his neck. There was no scarring or markings observed on Mr. Huguley's back or the back of his neck.

{¶44} When Mr. Huguley was shown the pictures, he stated that some of the wounds were from Ms. Williams and "like a couple of them" were self-inflicted. He denied that any in

the chest area were self-inflicted. When cross-examined about the lack of wounds to his back, Mr. Huguley explained, "[i]t felt like she was stabbing me in the back, but it was in the neck." He admitted that the wounds to the front of his neck were self-inflicted, but had difficulty remembering on which side of the neck Ms. Williams stabbed him. As the pictures were shown to him on the stand, he first thought the left was the side on which she stabbed him, but later corrected himself indicating she had stabbed him on the right side. He agreed that a picture of the right side showed four wounds and testified that she did "[a]ll those" and "[s]he was quick[]."

{¶45} Evidence and testimony was also presented regarding the location of the blood in the apartment. Detective Sandra Ridgeway-Williams testified that "there was a lot of blood" in the apartment, but none in the kitchen. Sergeant Timothy McLeod acknowledged on cross-examination that his report of investigation indicated that there was "blood in the area by the kitchen." Pictures taken of the crime scene show blood in the living room and by the door of the apartment. There is also blood on the living room carpet near the kitchen, but none on the linoleum in the kitchen itself. Sergeant McLeod conceded that, because the blood in that area was not tested, he could not tell whose blood it was.

{¶46} In the end, each side pointed out inconsistencies and questioned the credibility of the other side's witnesses. For instance, the defense questioned D.D. regarding differences between what she told the police on scene compared to what she told them at the station three days later. On cross-examination, D.D. also admitted that she and Ms. Williams were mad at Mr. Huguley the day before Ms. Williams' death. The State, likewise, questioned Mr. Huguley regarding inconsistencies or missing details between what he initially told the police and his in-court testimony. The State also questioned Mr. Huguley's credibility beyond what happened immediately leading up to Ms. Williams' death. For instance, Mr. Huguley admitted that he

"made [ ] up" a story that he was crying over difficulties in his relationship with Ms. Williams in order to convince a relative to speak to Ms. Williams about the relationship. On the other side, the defense suggested that the blood on the carpet near the kitchen should have been tested as it might have been Mr. Huguley's blood.

{¶47} As the Ohio Supreme Court has noted, "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of facts." *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. This is because "[t]he trier of fact is in the best position to judge the credibility of the witnesses." *State v. Curry*, 9th Dist. Summit No. 23104, 2007-Ohio-238, ¶ 19.

{¶48} Upon review, this Court cannot say that the jury lost its way in finding that Mr. Huguley failed to demonstrate by a preponderance of the evidence that he acted in self-defense. While there were some inconsistencies in the State's case, there were also inconsistencies in Mr. Huguley's version of the events. Under Mr. Huguley's version of the events, Ms. Williams was the initial aggressor and he believed he was in imminent danger of death or great bodily harm, thus justifying his use of deadly force. But, even under Mr. Huguley's version of the events, at the point in time that he stabbed Ms. Williams, she no longer had a weapon because he had taken the knife from her. Although Mr. Huguley testified that he still considered Ms. Williams "[a] threat," the jury was free to disbelieve that testimony or find it objectively unreasonable. *See State v. Keil*, 5th Dist. Richland No. 16CA28, 2017-Ohio-593, ¶ 42 ("threat ended when [the other party] was disarmed"). In addition to the fact that Mr. Huguley had disarmed Ms. Williams, the jury was presented evidence that Mr. Huguley was taller and weighed more than Ms. Williams, and that Mr. Huguley pushed D.D. out of the way when she attempted to aid Ms. Williams. Regarding the failure to test the blood on the carpet near the kitchen, the presence of

Mr. Huguley's blood in that area would at most support that Ms. Williams may have been the initial aggressor. The jury, who heard the witnesses first hand, was still free to "reject[] [Mr. Huguley's] contention that he had a bona fide belief that he was in imminent danger of death or great bodily harm." *See Jackson*, 22 Ohio St.3d at 285. "[T]his Court will not reverse a conviction where the jury chose to believe the testimony of the State's witnesses over that of the defendant's." *State v. Sommerville*, 9th Dist. Summit No. 25094, 2010-Ohio-3576, ¶ 18.

{¶49} Mr. Huguley's fourth assignment of error is overruled.

### III.

{¶50} Mr. Huguley's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

LYNNE S. CALLAHAN
FOR THE COURT

SCHAFER, P. J.
TEODOSIO, J.
CONCUR.

APPEARANCES:

ANGELA M. KILLE, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and RICHARD S. KASAY, Assistant Prosecuting Attorney, for Appellee.