[Cite as *State v. Robertson*, 2024-Ohio-2848.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF MEDINA | ) | |

STATE OF OHIO

    Appellee

v.

LOGAN J. ROBERTSON

    Appellant

C.A. No.    2023CA0022-M

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF MEDINA, OHIO
CASE No.    22CR0390

DECISION AND JOURNAL ENTRY

Dated: July 29, 2024

FLAGG LANZINGER, Judge.

**{¶1}** Logan Robertson appeals his conviction for murder from the Medina County Court of Common Pleas. For the following reasons, this Court affirms.

I.

**{¶2}** This appeal involves the shooting death of A.P., an 18-year-old woman whom Robertson (also 18 years old at the time) had been dating for about one year. A.P. was a senior in high school who worked two part-time jobs. Robertson and A.P. met while working at a fast-food restaurant together. Robertson had dropped out of high school and was unemployed at the time of the shooting.

**{¶3}** Robertson frequently stayed in his grandmother's ("Grandmother") basement, where he had a mattress on the floor, a television, a gaming chair, and a gaming system. A.P. had a friendly relationship with Grandmother and sometimes stayed with Robertson in Grandmother's basement.

**{¶4}** On May 3, 2022 (the day of the shooting), A.P. went over to Grandmother's townhouse after work. A.P. arrived around 9:30 p.m. and spoke with Grandmother about the upcoming senior prom. A.P. then walked downstairs to the basement. Robertson was alone in the basement, sitting in his gaming chair, drinking Twisted Tea (an alcoholic beverage), and playing online video games. Less than two hours later, A.P. sustained a fatal gunshot wound to her face and was pronounced dead on the scene.

**{¶5}** A grand jury indicted Robertson on one count of murder, with accompanying firearm and forfeiture specifications. Robertson pleaded not guilty and the matter proceeded to a jury trial.

**{¶6}** At trial, the State argued that Robertson purposely shot and killed A.P. because the two had a tumultuous relationship and Robertson thought A.P. was cheating on him with her ex-boyfriend. Robertson argued that A.P. died as a result of a tragic accident. This Court will summarize the evidence presented at trial, which included testimony from over two dozen witnesses.

<u>**Robertson and A.P.'s Relationship**</u>

**{¶7}** The State presented testimony from several friends of A.P. and/or Robertson. Friends testified that A.P. and Robertson had an on-again-off-again relationship, that they argued frequently, and that A.P. was planning on breaking up with Robertson around the time of her death. Friends testified that Robertson was jealous of A.P.'s ex-boyfriend, and that Robertson thought A.P. was cheating on him.

**{¶8}** One friend testified that A.P. told her she wanted to leave Robertson, but that A.P. was afraid Robertson was going to kill her. The friend testified that A.P. had sent her a copy of

text exchange between A.P. and Robertson wherein Robertson told A.P. that "she was going to drive him to the point where he was going to kill her."

{¶9} Friends testified that they had seen Robertson point a gun at A.P. in the past and/or that A.P. told them that Robertson had pointed a gun at her on more than one occasion. Friends testified that Robertson would bring his gun to social events, wave it around, point it at people, and take pictures with it. One friend testified that Robertson had pointed two guns at her (the friend's) head in the past, which was captured on video. The State played that video for the jury. The friend also testified that she had seen Robertson push and hit A.P., and that A.P. once told her that Robertson threatened to shoot her (A.P.). Friends and family of A.P. testified that A.P. had a bruise on her cheek around the time of the shooting, and that A.P. claimed it was a hickey.

{¶10} The State presented testimony from A.P.'s aunt who testified that she went through A.P.'s backpack after her death. A.P.'s aunt testified that she discovered a pamphlet about exiting unhealthy relationships, as well as a break-up note written in A.P.'s handwriting. One of A.P.'s friends testified that she attended a school assembly about domestic violence with A.P. a few days prior to her death, which is where A.P. obtained the pamphlet about exiting unhealthy relationships.

{¶11} The State presented testimony from the friend who sold the gun used in the shooting to Robertson. That friend testified that he tried to buy the gun back from Robertson multiple times because he knew A.P. was afraid of Robertson. The friend also testified that A.P. told him that Robertson had been "acting aggressive." The friend explained that he "didn't want this type of situation to happen where [A.P.] passes away . . . ." The State also presented testimony indicating that A.P. was familiar with guns, and that her father had taught her about gun safety.

**The Day of the Shooting**

{¶12} The State presented testimony from witnesses who were with A.P. on the day of shooting and/or had exchanged texts and/or messages on social media with her. The evidence indicated that A.P. went to Grandmother's townhouse in the morning to get her clothes for work, which she had left there. A friend testified that A.P. told her that Robertson had locked her out of the townhouse because Robertson thought she was cheating on him. Grandmother eventually let A.P. inside to get her work clothes.

{¶13} The State presented testimony from a friend who testified that she was with A.P. earlier in the day, and that A.P. told her she wanted to break up with Robertson but knew it would not go well. The friend testified that A.P. said: "I feel like the only way I can get out is . . . if he kills me . . . ." The friend testified that A.P. planned on retrieving her Xbox and a blanket from Grandmother's house (where A.P. sometimes stayed with Robertson) on the night of the shooting. The friend also testified that she exchanged messages with A.P. within minutes of the shooting. Some of those messages indicated that Robertson had hidden the Xbox and blanket from A.P., but that Robertson eventually gave them to her.

{¶14} Another friend testified that A.P. messaged her earlier in the day and told her that Robertson had locked her out of Grandmother's townhouse because Robertson thought she was cheating on him. The friend testified that she and A.P. messaged each other throughout the day, and that the last message she received from A.P. was at 10:59 p.m., which was moments before the shooting. The friend testified that the last message they exchanged was about how A.P. wanted to get Robertson a nicer phone. That friend also testified that Robertson posted: "Cheaters never win in life. Remember that shit." with a thumb's down emoji on Snapchat the day before the shooting.

{¶15} The State also presented testimony from two witnesses who were playing online video games with Robertson within minutes of the shooting. One of the witnesses testified that they had been playing video games for hours when Robertson suddenly muted his microphone and exited the game without saying good-bye, which was unusual. The other witness testified similarly, indicating that Robertson left the game around 10:50 p.m. "out of nowhere" without saying anything, which was unusual. Neither witness heard the shooting.

**The Police Response and Investigation**

{¶16} The State presented testimony from several police officers who responded to the scene, as well as the detectives who investigated the shooting. The testimony indicated that Robertson called 911 at 11:01 p.m. but then gave the phone to Grandmother. Grandmother told the 911 dispatcher that someone had been shot. When the police arrived, Robertson answered the door wearing only his socks and underwear. The police instructed Robertson to exit the townhouse.

{¶17} The police then went to the basement where Grandmother was performing CPR on A.P. The police observed A.P. lying on a mattress in a pool of blood with a gunshot wound to her face. A.P. had no signs of life. The police took over performing CPR and instructed Grandmother to exit the townhouse. The police observed a handgun on the floor next to the mattress, which they collected as evidence. There was no dispute that the handgun belonged to Robertson and that it was the gun that inflicted the fatal wound.

{¶18} The police observed six opened, twelve-ounce cans of Twisted Tea in the basement, which Robertson admitted to drinking over the course of the day. An officer who was a drug recognition expert evaluated Robertson and determined that Robertson was under the influence of alcohol and cannabis. However, that officer testified that Robertson seemed coherent and had no

difficulty answering questions. The lead detective who spoke with Robertson after the shooting testified that Robertson described himself as four-out-of-ten intoxicated, with one being completely sober and ten being the most intoxicated he had ever been. The detective also testified that she was able to have a casual conversation with Robertson.

{¶19} The State presented testimony indicating that Robertson provided law enforcement with varying versions of the events. One officer testified that Robertson told him that A.P. was playing with the gun and that it went off when he tried to take it from her. Another officer testified that Robertson told him that he was trying to stop A.P. from hurting herself, and that the gun went off when he was trying to take the gun away from her. That officer testified that Robertson later told him that his back was turned away from A.P. when he heard a gunshot.

{¶20} The lead detective on the case testified that Robertson's "story changed dramatically every time he told the story . . . ." During her interview with Robertson, Robertson told the detective that he thought A.P. had been texting her ex-boyfriend the day before the shooting, but that he later learned that A.P. had been texting her ex-boyfriend's sister. Robertson told the detective that he and A.P. had fought that morning, but that they were fine at the time of the shooting.

{¶21} The detective testified that Robertson initially told her that he had just finished playing his video game when he turned and saw A.P. pointing the gun at her head. Robertson told the detective that he told A.P. that the gun was loaded, that he went toward her, and that A.P. shot herself before he got to her. Robertson told the detective that he then gave A.P. CPR, which the detective did not believe due to the lack of blood on Robertson. The detective testified that Grandmother later confirmed that Robertson did not give A.P. CPR, and that when Grandmother instructed him to, Robertson responded: "Do I have to?"

{¶22} The detective testified that Robertson then changed his story. The detective testified that Robertson told her that A.P. was depressed, indicating that A.P. committed suicide. The detective testified that Robertson later told her that A.P. seemed fine, and that she was sitting on the mattress scrolling through social media on her phone while he was playing video games. Robertson told the detective that he turned around and saw A.P. playing with the gun, and that A.P. pointed the gun at her head. Robertson told the detective that he told A.P. to stop because the gun was loaded, but that A.P. said: "No, it's not. You never keep it loaded" and pulled the trigger.

{¶23} The detective testified that, in another version of the events, Robertson told her that he and A.P. were playing with the gun by loading it, expelling the round, catching it, and reloading the gun. The detective testified that Robertson told her that he and A.P. were laughing and joking when the gun accidentally went off.

{¶24} The police obtained messages that Robertson and A.P. exchanged on social media on the day of the shooting. The detective testified that the messages clearly indicated that Robertson and A.P. had been arguing about A.P.'s ex-boyfriend, and that they were breaking up.

### The Jailhouse Informant

{¶25} The State presented testimony from a jailhouse informant. The jailhouse informant testified that Robertson told him that his girlfriend cheated on him (and named A.P.'s ex-boyfriend by name) and that she was going to break up with him, which he (Robertson) would not accept. The jailhouse informant testified that Robertson told him the shooting "wasn't an accident." Defense counsel cross-examined the jailhouse informant about his extensive criminal history, including crimes of dishonesty.

**The Forensic Evidence**

**{¶26}** The State presented testimony from a forensic pathologist who confirmed that A.P. died as a result of a gunshot wound to her face. The forensic pathologist also testified that A.P. had a muzzle imprint on her face, indicating that it was a contact-range gunshot. The forensic pathologist further testified that the toxicology report indicated that A.P. had nicotine and marijuana in her system at the time of her death.

**The Defense's Evidence**

**{¶27}** The defense proceeded under the theory that Robertson and A.P. were no longer fighting at the time of the shooting, and that the shooting was a result of a tragic accident. In support of its theory, the defense presented evidence and/or elicited testimony on cross-examination indicating that Robertson and A.P. were still planning to attend prom together. The defense also presented evidence and/or elicited testimony on cross-examination indicating that none of the texts and/or social media messages A.P. sent to friends or family while in Grandmother's basement indicated that A.P. was stressed or in fear moments before the shooting.

**{¶28}** The defense presented testimony from three witnesses: a forensic scientist, Robertson, and Grandmother. This Court will summarize each witnesses' testimony in turn.

**{¶29}** The forensic scientist testified that the gun used in the shooting had more of A.P.'s DNA on it than Robertson's DNA. On cross-examination, the forensic scientist acknowledged that she did not know the source of the DNA samples she tested (e.g., blood or touch DNA), and that A.P.'s blood could have been on the gun.

**{¶30}** According to Robertson's testimony, he and A.P. had a "wonderful" relationship, albeit with some "ups and downs." Robertson testified that, on the day of the shooting, A.P. arrived at Grandmother's townhouse while he was playing video games in the basement. Robertson

testified that A.P. sat on the mattress behind him and was scrolling through social media on her phone. Robertson turned and saw A.P. playing with his gun and waving it around. A.P. then pointed the gun at herself, and Robertson told her to stop because the gun was loaded. A.P. responded that the gun was never loaded, and Robertson walked toward A.P. to take the gun away from her. Robertson testified that he had his hand on the gun as he tried to take the gun from A.P., and that A.P. was trying to pull the gun back from him when the "weapon [wa]s fired." Robertson testified that he dropped the gun, started chest compressions, and then ran up the stairs as Grandmother was coming down the stairs. Robertson then used Grandmother's phone to call 911 and waited upstairs for the police to arrive.

{¶31} On cross-examination, the State presented Robertson with multiple messages he exchanged with A.P. indicating that he and A.P. had been fighting the day of the shooting. The messages indicated that Robertson called A.P. a "liar and a cheater[,]" "stupid bitch[,]" "PIECE OF SHIT," "foul ass hoe[,]" and "pathetic[,]" among other insults. The messages also indicated that Robertson threatened to burn A.P.'s belongings. Robertson responded by claiming that not every relationship is perfect, and that he loved A.P. During recross-examination, the State asked Robertson if he ever texted A.P.: "You're going to push me to the point where I'm just going to kill you[,]" to which Robertson responded: "Maybe at one point in time."

{¶32} The State also cross-examined Robertson regarding the varying versions of the events that he provided to law enforcement. Robertson could not explain the variations in his versions of the events other than to say it was a traumatic experience, that he was tired and intoxicated, and that he eventually told the detective what he thought she wanted to hear.

{¶33} Robertson admitted on cross-examination that he lied to the detective when he told her that he and A.P. were playing with his gun (by loading and unloading it) when it went off.

Robertson also admitted that he lied to an officer when he told the officer that his back was turned to A.P. when he heard the gun go off. Robertson further admitted that he lied when he told officers on the night of the shooting that he did not think the gun was loaded, which was contradicted by his own testimony that he told A.P. the gun was loaded.

{¶34} Grandmother testified that A.P. came over on the night of the shooting and that they discussed the upcoming senior prom before A.P. went to the basement. Grandmother testified that she heard a loud noise, which she initially thought was someone banging into the furnace in the basement. Grandmother testified that she yelled downstairs to see what had happened, and that Robertson was running up the stairs screaming and crying, saying the gun went off and A.P. had been shot. Grandmother testified that she started CPR on A.P. and instructed Robertson to call 911.

{¶35} On cross-examination, the State presented Grandmother with texts she exchanged with A.P. while A.P. was in the basement on the night of the shooting. The texts indicated that Robertson and A.P. had been fighting that day and were not getting along. In one of the texts, Grandmother indicated that Robertson "better straighten up" or she was not going to give him the new phone she had bought him.

**The Verdict and Sentence**

{¶36} The jury found Robertson guilty of murder and the accompanying firearm and forfeiture specifications. The trial court sentenced Robertson to an indefinite prison term of 15 years to life for murder, as well as a 3-year prison term for the firearm specification. Robertson now appeals, raising five assignments of error for this Court's review.

II.

ASSIGNMENT OF ERROR I

THE STATE OF OHIO COMMITTED PROSECUTORIAL MISCONDUCT DURING CROSS-EXAMINING APPELLANT INSTRUCTING HIM TO TELL THE FATHER OF [A.P.] HOW HIS DAUGHTER DIED.  SAID TRIAL MISCONDUCT WAS PREJUDICIAL, WENT BEYOND THE BOUNDS OF PERMISSIBLE CROSS-EXAMINATION, AND CONSTITUTED PLAIN ERROR.

{¶37} In his first assignment of error, Robertson argues that the State committed prosecutorial misconduct during cross-examination.  This Court disagrees.

{¶38} "[I]n deciding whether a prosecutor's conduct rises to the level of prosecutorial misconduct, a court determines if the prosecutor's actions were improper, and, if so, whether the defendant's substantial rights were actually prejudiced." *State v. Haywood*, 2017-Ohio-8299, ¶ 62 (9th Dist.).  "[A] judgment may only be reversed for prosecutorial misconduct when the improper conduct deprives the defendant of a fair trial." (Alteration sic.) *Id.*, quoting *State v. Knight*, 2004-Ohio-1227, ¶ 6 (9th Dist.).  "The defendant must show that, but for the prosecutor's misconduct, the trier of fact would not have convicted him." *Id.*  "The touchstone of the analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *Id.*, quoting *State v. Diar*, 2008-Ohio-6266, ¶ 140.  "A reviewing court is to consider the trial record as a whole, and is to ignore harmless errors . . . ." *Knight* at ¶ 6.

{¶39} Robertson argues that the State committed prosecutorial misconduct during his cross-examination when the prosecutor asked Robertson to look A.P.'s father in the eyes (who was present in the courtroom) and tell him "how his daughter got killed" and "how his daughter died." Defense counsel objected.  The trial court overruled the objection but called for a 15-minute recess.  The record does not indicate that Robertson responded to the prosecutor's comment.

{¶40} Robertson argues that the prosecutor's comment put him in an untenable position in front of the jury. Robertson argues that, by not responding, the jury could have wrongfully assumed that he was guilty of murder. Robertson, therefore, concludes that the prosecutor's comment deprived him of a fair trial.

{¶41} Even assuming that the prosecutor's comment was improper, Robertson has not established that, but for the prosecutor's comment, the jury would not have convicted him. The record reflects that Robertson's defense counsel immediately objected, and that Robertson never verbally responded to the prosecutor's comment. As explained in this Court's analysis of Robertson's third assignment of error below, the State presented overwhelming evidence of Robertson's guilt. Thus, considering the record as a whole, this Court cannot say that the prosecutor's comment deprived Robertson of a fair trial. Robertson's first assignment of error is overruled.

ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS WHEN HIS RIGHT TO COUNSEL WAS VIOLATED AS GUARANTEED BY THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE 1, SECTION 10 OF THE OHIO CONSTITUTION.

{¶42} In his second assignment of error, Robertson argues that the trial court erred by denying his pre-trial motion to suppress. This Court disagrees.

{¶43} A motion to suppress evidence presents a mixed question of law and fact. *State v. Burnside*, 2003-Ohio-5372, ¶ 8. "When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *Id.*, citing *State v. Mills*, 62 Ohio St.3d 357, 366 (1992). Thus, a reviewing court "must accept the trial court's findings of fact if they are supported by competent,

credible evidence." *Id.*, citing *State v. Fanning*, 1 Ohio St.3d 19, 20 (1982). "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706, 710 (4th Dist. 1997). Accordingly, this Court grants deference to the trial court's findings of fact but conducts a de novo review of whether the trial court applied the appropriate legal standard to those facts. *State v. Booth*, 2003-Ohio-829, ¶ 12 (9th Dist.).

**{¶44}** "When a suspect in a criminal investigation requests counsel, police questioning must cease until a lawyer is provided or the suspect reinitiates the interrogation." *State v. Huguley*, 2017-Ohio-8300, ¶ 9 (9th Dist.). "But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, [Supreme Court] precedents do not require the cessation of questioning." (Alterations sic.) *Id.*, quoting *Davis v. United States*, 512 U.S. 452, 459 (1994). "Courts have found that a suspect asking questions about counsel does not amount to an unequivocal request for counsel. *Id.* A defendant may waive his right to counsel even if he is already represented by counsel "so long as relinquishment of the right is voluntary, knowing, and intelligent." *State v. Taylor*, 2024-Ohio-1752, ¶ 24, quoting *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009).

**{¶45}** Prior to trial, defense counsel moved to suppress the statements Robertson made to the lead detective on May 10, 2022. By way of background, the record reflects that the detective interviewed Robertson in the early morning hours of May 4, 2022 (i.e., a few hours after the shooting), for about two hours. There is no dispute that the detective read Robertson his *Miranda* rights, and that Robertson voluntarily spoke with the detective at that time.

**{¶46}** On May 10, 2022—after Robertson had been appointed counsel—the detective spoke with Robertson again at the jail without his counsel present. Robertson argued in his motion to suppress that the interview "violated the attorney client privilege since the [d]etective certainly must have known that [he] already had counsel." Robertson concluded that the trial court should suppress any and all information the detective gathered on May 10, 2022.

**{¶47}** At the suppression hearing, the detective testified that she did not know Robertson had been appointed counsel when she went to the jail to speak with him on May 10, 2022. The detective testified that she read Robertson his *Miranda* rights and explained that she wanted to ask him some clarifying questions. Robertson signed a form indicating that he understood his *Miranda* rights. The detective testified that the same form included a "Waiver of Rights" section, which Robertson did not sign.

**{¶48}** About one minute into his interaction with the detective, Robertson asked: "What if my lawyer told me not to answer anything?" to which the detective responded: "Well, then I would consider the advice of your attorney, but the questions I'm going to ask you are directly related to the incident." The detective then spoke with Robertson about him completing a written statement on a form the detective brought with her. Robertson asked: "Well, can I just get one of those [forms]…[a]nd then I'll call my lawyer when I get back[?]" to which the detective responded "Sure, absolutely."

**{¶49}** The record reflects that Robertson then began speaking with the detective about the shooting without indicating that he wanted to speak with his lawyer, and without indicating that he did not want to answer any questions. The interview lasted about an hour and a half.

**{¶50}** At the end of the suppression hearing, the trial court overruled Robertson's motion to suppress. In doing so, the trial court reasoned that Robertson never invoked his right to counsel.

The trial court noted that there was no indication that Robertson told the detective that he wanted to speak with his lawyer before or during the interview with the detective.

**{¶51}** On appeal, Robertson has not argued that he invoked his right to counsel during the interview on May 10, nor has he argued that the trial court erred by determining that he did not request counsel during that interview. Instead, Robertson argues that "[t]he [d]etective's meeting with [him] violated the attorney client privilege since the [d]etective certainly must have known that [he] already had counsel." Robertson summarily concludes that "[a]ll information gathered by the [d]etective from the jail meeting with [him] should have been suppressed and ruled inadmissible at trial."

**{¶52}** Robertson has not identified which statements from the May 10 interview were used against him at trial. *See* App.R. 16(A)(7). This Court's review of the record indicates that the State briefly questioned the detective about the May 10 interview. The detective testified that the purpose of that interview was to have Robertson complete a written statement (which he never did), and to get his final version of the events. The detective testified that the final version Robertson provided was consistent with the version Robertson previously provided wherein Robertson said that he and the victim were sitting on the mattress playing with the gun when it went off. The detective testified that Robertson acknowledged in the May 10 interview that his finger was on the trigger.

**{¶53}** Defense counsel also questioned Robertson about the May 10 interview at trial. According to Robertson, he kept talking with the detective because he had nothing to hide.

**{¶54}** Even assuming that the trial court erred by denying Robertson's motion to suppress, Robertson has not explained how he suffered prejudice. *See* App.R. 16(A)(7); *State v. Jenkins*, 2018-Ohio-4814, ¶ 15 (9th Dist.), citing Crim.R. 52(A). At most, the statements appear

to have been cumulative of other evidence presented at trial. *State v. Conway*, 2006-Ohio-2815, ¶ 59 (concluding that the admission of cumulative evidence was harmless error). To the extent that any of the statements were not cumulative, it is not this Court's duty to identify those statements and construct an argument on Robertson's behalf. *State v. Meyerson*, 2023-Ohio-708, ¶ 43 (9th Dist.), quoting *State v. Beverly*, 2019-Ohio-957, ¶ 6 (9th Dist.) ("[T]his Court will not 'guess at undeveloped claims on appeal' or construct arguments to support an assignment of error."). Because Robertson has not established that he suffered prejudice, any error in the trial court's denial of his motion to suppress was harmless. Robertson's second assignment of error is overruled.

ASSIGNMENT OF ERROR III

> THE TRIAL COURT ERRED BY ALLOWING EVID. R. 404(B) OTHER ACTS EVIDENCE TO BE ADMITTED AS EVIDENCE OVER DEFENSE COUNSEL'S OBJECTIONS AT TRIAL

**{¶55}** In his third assignment of error, Robertson argues that the trial court erred by allowing the State to present other-acts evidence. This Court disagrees.

**{¶56}** "The admissibility of other-acts evidence pursuant to Evid.R. 404(B) is a question of law." *State v. Hartman*, 2020-Ohio-4440, ¶ 22. Evid.R. 404(B) provides that "[e]vidence of any other crime, wrong or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Evid.R. 404(B)(1). It also provides that "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Evid.R. 404(B)(2). As the Ohio Supreme Court has explained, "[t]he key is that the evidence must prove something other than the defendant's disposition to commit certain acts." *Hartman* at ¶ 22. "Thus, while evidence showing the defendant's character or propensity to

commit crimes or acts is forbidden, evidence of other acts is admissible when the evidence is probative of a separate, nonpropensity-based issue." *Id.*

**{¶57}** Even if a trial court improperly admits other-acts evidence, "[e]rror in the admission of other act testimony is harmless when there is no reasonable possibility that the testimony contributed to the accused's conviction." *State v. Tench*, 2018-Ohio-5205, ¶ 177, quoting *State v. Lytle*, 48 Ohio St.2d 391 (1976), paragraph three of the syllabus. "[A]n improper evidentiary admission under Evid.R. 404(B) may be deemed harmless error on review when, after the tainted evidence is removed, the remaining evidence is overwhelming." (Alteration sic.) *Tench* at ¶ 177, quoting *State v. Morris*, 2014-Ohio-5052, ¶ 32.

**{¶58}** Here, over defense counsel's objection, the State presented testimony regarding an incident that occurred in August 2021 (i.e., several months prior to the May 3, 2022, shooting) involving Robertson and A.P.'s ex-boyfriend. A.P.'s ex-boyfriend testified that Robertson and several of his friends showed up to his parent's house in August 2021 to fight him because he (the ex-boyfriend) was spending time with A.P. A.P.'s ex-boyfriend testified that his parents came outside, which caused Robertson and his friends to get back into Robertson's car and leave. A.P.'s ex-boyfriend testified that Robertson drove halfway down the street, then got out of his car and yelled "I'll be back[!]" The ex-boyfriend then ran inside the house. A few minutes later, the ex-boyfriend heard three gunshots. The ex-boyfriend testified that he gave the police a statement about the incident, but nothing came of the matter. He also testified that he had no further interactions with Robertson after that incident.

**{¶59}** The ex-boyfriend's father testified similarly, but testified that he remained outside after Robertson left. The ex-boyfriend's father testified that he saw the car drive back down the street a few minutes later, and that someone (although he could not see who) from inside the car

fired three shots into the air in front of his house. The ex-boyfriend's father testified that he called the police.

{¶60} The ex-boyfriend's mother testified that she had gone back inside after Robertson drove away, but that she heard the gunshots from inside the house. She then asked everyone inside of the house—including A.P.—if they were okay. The ex-boyfriend's mother testified that, after the police arrived, A.P. confided in her that Robertson had held a gun to her head and threatened to kill her on three different occasions.

{¶61} The State argued that the evidence regarding the August 2021 incident was admissible because it was being offered to show Robertson's motive and the lack of an accident. As explained below, even assuming the trial court erred by admitting testimony regarding the August 2021 incident, any error was harmless because the State presented overwhelming evidence of Robertson's guilt. *Tench*, 2018-Ohio-5205, at ¶ 177.

{¶62} The State presented evidence from over two dozen witnesses. The evidence indicated that: (1) Robertson had held a gun to A.P.'s head and threatened to kill her in the past; (2) Robertson and A.P. were fighting on the day of the shooting because Robertson thought A.P. was cheating on him; (3) A.P. was planning on breaking up with Robertson; (4) A.P. told her friend on the day of the shooting that she felt like the only way she could get out of the relationship was if Robertson killed her; (5) Robertson posted on Snapchat: "Cheaters never win in life. Remember that shit." with a thumb's down emoji the day before the shooting; (6) A.P. had a muzzle imprint on her face; and (7) A.P. sustained a contact-range gunshot to her face. The State also presented testimony indicating that A.P. was familiar with guns and gun safety, undermining Robertson's position that the shooting was an accident.

{¶63} The State further presented evidence indicating that Robertson gave varying versions of the events to the police, and that he admitted to lying about certain factual details (e.g., that he had his back to A.P. when he heard a gunshot and that he did not know the gun was loaded). Simply put, the State presented overwhelming evidence in support of Robertson's guilt. Thus, even if the trial court erred by admitting testimony regarding the August 2021 incident, any error in that regard was harmless. *Tench*, 2018-Ohio-5205, at ¶ 177. Robertson's third assignment of error is overruled.

ASSIGNMENT OF ERROR IV

THE EVIDENCE WAS INSUFFICIENT TO SUPPORT THE JURY VERDICT
OF GUILTY FOR MURDER.

{¶64} In his fourth assignment of error, Robertson argues that the State failed to present sufficient evidence in support of his conviction for murder. This Court disagrees.

{¶65} Whether a conviction is supported by sufficient evidence is a question of law, which we review de novo. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). In making this determination, we must view the evidence in the light most favorable to the prosecution:

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. In analyzing the sufficiency of the evidence, "[w]e do not evaluate credibility, and we make all reasonable inferences in favor of the State." *State v. Thomas*, 2020-Ohio-3538, ¶ 7 (9th Dist.)

{¶66} R.C. 2903.02(A), under which Robertson was convicted, provides that "[n]o person shall purposely cause the death of another . . . ." R.C. 2901.22(B) defines "purposely" as follows:

> A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature.

It is well established that the State may prove the elements of an offense through direct or circumstantial evidence, which possess the same probative value. *State v. Altomare*, 2024-Ohio-1721, ¶ 20 (9th Dist.). "[S]ince the fact-finder can never truly get inside the defendant's mind, mens rea is often proved by circumstantial evidence." *State v. St. John*, 2009-Ohio-6248, ¶ 21 (7th Dist.).

**{¶67}** Here, Robertson argues that the evidence presented at trial indicated that he acted recklessly, not purposely, and that he should have instead been convicted of reckless homicide. Robertson argues that the evidence showed that A.P. had marijuana in her system, that he had consumed alcohol and cannabis that evening, and that the shooting occurred as a result of a tragic accident. In doing so, Robertson asserts that as he "attempted to pull the handgun away from [A.P., she] pulled back and the handgun fired." Robertson also notes that A.P.'s DNA was on the gun, including the trigger.

**{¶68}** Robertson's argument lacks merit. As set forth in the preceding assignment of error, the State presented evidence indicating that: (1) Robertson had held a gun to A.P.'s head and threatened to kill her in the past; (2) Robertson and A.P. were fighting on the day of the shooting because Robertson thought A.P. was cheating on him; (3) A.P. was planning on breaking up with Robertson; (4) A.P. told her friend on the day of the shooting that she felt like the only way she could get out of the relationship was if Robertson killed her; (5) Robertson posted on Snapchat: "Cheaters never win in life. Remember that shit." with a thumb's down emoji the day before the shooting; (6) A.P. had a muzzle imprint on her face; and (7) A.P. sustained a contact-

range gunshot to her face. The State also presented testimony indicating that A.P. was familiar with guns and gun safety.

{¶69} The evidence reflected that Robertson and A.P. were the only two people in the basement at the time of the shooting, and that A.P. sustained a fatal, contact-range gunshot to her face. Given the evidence presented, a rational trier of fact could have found that the State proved beyond a reasonable doubt that Robertson purposely shot A.P. in the face, causing her death. Accordingly, Robertson's fourth assignment of error is overruled.

ASSIGNMENT OF ERROR V

APPELLANT'S CONVICTION FOR MURDER WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶70} In his fifth assignment of error, Robertson argues that the jury's verdict was against the manifest weight of the evidence. This Court disagrees.

{¶71} When considering a challenge to the manifest weight of the evidence, this Court is required to consider the entire record, "weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist. 1986). "A reversal on this basis is reserved for the exceptional case in which the evidence weighs heavily against the conviction." *State v. Croghan*, 2019-Ohio-3970, ¶ 26 (9th Dist.). This Court "will not overturn a conviction as being against the manifest weight of the evidence simply because the trier of fact chose to believe the State's version of events over another version." *State v. Warren*, 2020-Ohio-6990, ¶ 25 (9th Dist.), quoting *State v. Tolliver*, 2017-Ohio-4214, ¶ 15 (9th Dist.).

{¶72} Robertson's argument in support of his fifth assignment of error is almost a verbatim recitation of his argument in support of his fourth assignment of error. Robertson again argues that the evidence at trial indicated that he acted recklessly, not purposely, and that he should have instead been convicted of reckless homicide.

{¶73} In support of his assignment of error, Robertson relies on his version of the events, which the jury was not required to believe. *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus; *Prince v. Jordan*, 2004-Ohio-7184, ¶ 35 (9th Dist.). The jury was in the best position to observe all of the witnesses' demeanor, and to use those observations to weigh their credibility. *State v. James*, 2019-Ohio-2604, ¶ 19 (9th Dist.). In doing so, the jury in this case chose to believe the State's version of the events, which is not a basis for reversal. *Warren*, 2020-Ohio-6990, at ¶ 25.

{¶74} Having reviewed the entire record, this Court cannot say that the jury "clearly lost its way and created such a manifest miscarriage of justice that the conviction[s] must be reversed and a new trial ordered." *Otten*, 33 Ohio App.3d at 340. Accordingly, Robertson's fifth assignment of error is overruled.

### III.

{¶75} Robertson's assignments of error are overruled. The judgment of the Medina County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

JILL FLAGG LANZINGER
FOR THE COURT

STEVENSON, P. J.
SUTTON, J.
CONCUR.

APPEARANCES:

ERIC D. HALL, Attorney at Law, for Appellant.

S. FORREST THOMPSON, Prosecuting Attorney, and STEFANIE H. ZARANEC, Assistant Prosecuting Attorney, for Appellee.