[Cite as *State v. Mayes*, 2026-Ohio-1081.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio

        Appellee/Cross-appellant

v.

Tasani Mayes

        Appellant/Cross-appellee

Court of Appeals No. L-25-00098

Trial Court No. CR0202402554

**<u>DECISION AND JUDGMENT</u>**

Decided: March 27, 2026

* * * * *

Julia R. Bates, Prosecuting Attorney, and
Samantha Crist, Assistant Prosecuting Attorney, for appellee/cross-appellant.

Laurel Kendall, for appellant/cross-appellee.

* * * * *

MAYLE, J.

{¶ 1} Following a jury trial, defendant-appellant/cross-appellee, Tasani Mayes, appeals the May 7, 2025 judgment of the Lucas County Court of Common Pleas, convicting him of felonious assault and improperly discharging a firearm at or into a habitation, with accompanying firearm specifications.  Plaintiff-appellee/cross-appellant,

the State of Ohio, has filed a cross-appeal, seeking to correct alleged errors in the trial court's sentencing entry.  For the following reasons, we affirm, in part, and reverse, in part.

## I.      Background

{¶ 2} Tasani Mayes was charged with the following offenses in connection with the October 20, 2024 shooting of C.W.:  felonious assault, a violation of R.C. 2903.11(A)(1) and (D)(1)(a), a second-degree felony (Count 1); felonious assault, a violation of R.C. 2903.11(A)(2) and (D)(1)(a), a second-degree felony (Count 2); improperly discharging a firearm at or into a habitation or school safety zone, a violation of R.C. 2923.161(A)(1) and (C), a second-degree felony (Count 3); and discharge of a firearm on or near a prohibited premises, a violation of R.C. 2923.162(A)(3) and (C)(3), a second-degree felony (Count 4).  All four counts carried three-year firearm specifications under R.C. 2941.145(A).  The matter proceeded to a jury trial at which the following evidence was presented.

{¶ 3} On October 20, 2024, at 3:39 p.m., a ShotSpotter device detected eight shots fired at 733 Pinewood Avenue in Toledo.  Toledo Police officers were dispatched to the scene.  Approximately five minutes later, J.G., a resident of 750 Vance Street, called 9-1-1 to report that there was a man on her porch who had just been shot.  In the recording of the 9-1-1 call, the man can be heard in the background crying and saying that he had run for his life and was scared.  He told J.G.—whom he did not know—that he ran from his sister's house on Pinewood Avenue to Vance Street where he sought her help.  J.G. told the 9-1-1 operator that the man knew who shot him, but would not provide the shooter's

2.

name. The man identified himself as C.D. J.G. confirmed that he had no weapons on him.

{¶ 4} When police arrived at 750 Vance at approximately 3:47 p.m., they found the victim dressed in a gray sweatsuit, sitting on a chair on the porch, his left side soaked in blood. He had been shot in the shoulder. He appeared to be scared and in pain, possibly in shock, and was fading in and out of consciousness. As officers tended to him, he became anxious when he saw a vehicle that he believed had been involved in the incident.

{¶ 5} When asked for his name, the man first identified himself only by his first name, but additional crews who arrived at the scene knew from prior encounters that his name was C.W. Officer Zachary Cairl asked C.W. who shot him, and C.W. said it was "Sani from the RECC." Officer Cairl knew that "Sani" was Tasani Mayes, and Mayes was known to associate with a group called RECC Squad. Some of the officers left the scene to look for Mayes, while paramedics continued to tend to C.W. C.W. was taken by ambulance to St. Vincent Hospital. He suffered gunshot wounds to the left shoulder and back and sustained a scapular fracture.

{¶ 6} Meanwhile, a group of people had gathered outside near 725 Pinewood after hearing the gunshots. No one admitted witnessing the shooting, but witnesses reported that multiple males were present and two men dressed in red and one man dressed in black fled the scene. C.W. told police that the person who shot him was not wearing a shirt.

3.

{¶ 7} A woman named K.M. approached police and reported seeing a man in her backyard wearing all gray. Police would eventually learn that K.M. lived at 731 Pinewood, was in a romantic relationship with Mayes, and was the mother of Mayes's children. The woman who lived at 729 Pinewood also came outside, but denied witnessing the shooting. Police later learned that the woman at 729 Pinewood was C.W.'s sister. Officer Daniel Welch described that 729 and 731 Pinewood are connected and share a backyard. C.W.'s cell phone and flipflops were found in the backyard.

{¶ 8} Officers were able to locate seven .40 caliber shell casings at the scene. The positions of those casings led them to conclude that the shots were fired from the street in front of 729 Pinewood. There were bullet holes in a trash can at 729 Pinewood and bullet holes in the siding of the house located at 725 Pinewood—725 and 729 Pinewood are divided by a driveway. Police learned that a man named D.S. was inside 725 Pinewood at the time of the shooting. They also learned that there were children playing outside when the shooting occurred.

{¶ 9} During the investigation, Detective Benjamin Jordan learned that C.W. was friends with Mayes's brother, O.S. Detective Jordan received information that C.W. had been feuding with Mayes. C.W.'s phone contained messages with a contact named "Sani." The two briefly argued in the messages and made reference to O.S. Contrary to the information gathered by Detective Jordan, Mayes indicated during a jailhouse phone call that he did not know the victim. However, in another jailhouse phone call, he said that he grew up with him.

4.

{¶ 10} After presenting this evidence, the State rested. Mayes moved for acquittal under Crim.R. 29. The trial court denied the motion. Mayes presented no evidence. He rested then renewed his motion for acquittal. The trial court again denied his motion.

{¶ 11} The jury found Mayes guilty of Counts 1 through 3 and the accompanying firearm specifications. It found him not guilty of Count 4. The trial court found that Counts 1 and 2 merged for purposes of sentencing. The State elected to have Mayes sentenced on Count 1. The trial court imposed a minimum prison term of seven years and a maximum term of ten and one-half years on Count 1, plus three years on the firearm specification, and a term of seven years on Count 3, plus three years on the firearm specification, all to be served consecutively.

{¶ 12} Mayes appealed. He assigns the following errors for our review:

> I. APPELLANT WAS DENIED A FAIR TRIAL WHEN THE COURT ADMITTED ARGUABLY INADMISSIBLE HEARSAY STATEMENTS BY THE VICTIM TO IDENTIFY APPELLANT, WHEN THE VICTIM DID NOT APPEAR AT TRIAL[.]

> II. THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT DENIED APPELLANT'S CRIM. R. 29 MOTION FOR ACQUITTAL BASED ON EVIDENTIARY ISSUES.

> III. APPELLANT'S CONVICTIONS FOR FELONIOUS ASSAULT AND DISCHARGE OF A FIREARM ON OR NEAR PROHIBITED PREMISES WERE NOT SUPPORTED BY THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 13} The State filed a cross-appeal. It assigns the following errors for our review:

> I. The trial court committed reversible error in failing to put the proper code section for count 2 felonious assault as R.C. 2913.11(A)(2) in its Judgement Entry.

II. The trial court committed reversible error in failing to specify Appellant's felony level for count three in its Judgment Entry.

III. The trial court committed reversible error in failing to impose the indefinite prison term on count two and three in its Judgement Entry[.]

## II.     Law and Analysis

{¶ 14} In his first assignment of error, Mayes argues that the trial court erred when it admitted the hearsay statements of C.W. identifying Mayes as the shooter.  In his second and third assignments of error, he challenges the weight and sufficiency of the evidence.

{¶ 15} In its assignments of error, the State argues that the trial court erred when it failed to include in the sentencing entry (1) the proper code section for Count 2, (2) the felony level for Count 3, and (3) an indefinite prison term for Counts 2 and 3.

{¶ 16} We address each of the parties' assignments in turn.

### A.     Mayes's Appeal

#### 1.     Hearsay Evidence Identifying Mayes as the Shooter

{¶ 17} C.W. did not testify at trial.  The only evidence identifying Mayes as the shooter came from C.W.'s out-of-court statements.  In his first assignment of error, Mayes argues that the trial court erred when it admitted C.W.'s out-of-court statements.

{¶ 18} Several weeks before trial, the State filed a motion in limine alerting the court that it intended to introduce C.W.'s statements.  The State sought a ruling that the statements were admissible as excited utterances.

6.

{¶ 19} There were four sets of statements the State sought to admit. The first statements at issue were made during the 9-1-1 call. The dispatcher asked J.G. if the victim knew who shot him. She responded, "he said he does, but he ain't telling me who did it." The victim can be heard in the background saying that he had been "running for his life" from his sister's house on Pinewood and had dropped his cell phone. J.G. told the dispatcher that C.W. was asking for his mother. The victim said his name was C.D.[1]

{¶ 20} The second statement was made while C.W. was being tended to by paramedics and was recorded on officers' body-worn cameras. The first responding officers approached C.W. and were evaluating his injuries. C.W. was fading in and out of consciousness and officers repeatedly encouraged him to "stay with us," "stay awake," "you're alright, you're alright." He asked for water. Firefighters arrived and paramedics started rendering care at 3:51 p.m. Other officers arrived on the scene and were advised that C.W. knew the name of the shooter. They asked C.W. to tell them who shot him. At 3:54 p.m., C.W. told them "Sani from the RECC Squad." The officers knew "Sani" to be Tasani Mayes. An officer immediately reported the identity of the shooter to dispatch and efforts began to find Mayes.

{¶ 21} The third statements occurred while C.W. was lying in a hospital bed receiving medical care. At 4:26 p.m., medical professionals were connecting him to monitors, with police at his bedside. An officer asked if he remembered the name of the shooter. C.W. again told them "Tasani." He told them that his sister has a doorbell

_____

[1] "D" is the victim's middle initial.

7.

camera and Mayes was not wearing a mask.  This statement was recorded on an officer's body-worn camera.

{¶ 22} The final statements occurred at 5:26 p.m.  C.W. identified Mayes in a photo lineup and said that he was 1000% positive that that was the person who shot him.  He expressed fear and stated that he should be dead because the shooter used a "fully automatic" "Glock with a switch."  At 5:35 p.m., C.W. told Detective Jordan that the shooter was "Tasani," and C.W. said that Mayes did not have a mask or a shirt on.  He said that after he was shot, Mayes said, "I got you!"

{¶ 23} The State argued that all four statements were excited utterances, admissible under Evid.R. 803(2).  The trial court ruled on the State's motion in limine just before opening statements at trial, and it memorialized its decision in a judgment journalized after trial, on April 1, 2025.  The trial court agreed with the State that the statements made during the 9-1-1 call and while the victim was on the porch were admissible as excited utterances, but did not allow the State to admit the statements made in the hospital.

{¶ 24} The trial court first analyzed the issue from a Confrontation-Clause perspective.  It concluded that statements made during the 9-1-1 call and to first responders were nontestimonial because they were made in the immediate aftermath of the shooting during an "ongoing emergency."  It reached a contrary conclusion regarding the statements made at the hospital.  It found that those statements were testimonial because they were not made as part of an effort to secure the scene and protect public safety, but rather, were made in response to the officers' efforts to gain information for a

8.

criminal investigation. It ruled that C.W.'s statements made at the hospital were inadmissible under the Confrontation Clause.

{¶ 25} The trial court then evaluated the nontestimonial statements to determine whether they qualify as excited utterances. Citing *State v. Knecht*, 2015-Ohio-4316, ¶ 26 (12th Dist.), it observed that "[a] hearsay statement is admissible as an excited utterance if: '(1) there was an event startling enough to produce a nervous excitement in the declarant; (2) the statement was made while under the stress of excitement caused by the event; (3) the statement related to the startling event; and (4) the declarant must have had an opportunity to personally observe the startling event.'"

{¶ 26} The trial court concluded that it was "beyond rational dispute that surviving an attack by gunfire on the street is the type of 'startling event' contemplated by Evid.R. 803(2);" "C.W.'s statements 'related to the startling event;'" and "C.W. 'personally observe[d] the startling event.'" Finally, as to whether the statements were made while C.W. was still under the effects of the shooting, the court found that he was.

{¶ 27} The trial court explained that the 9-1-1 call was made after C.W. had "fle[d] for his life" and was "bleeding profusely" from the injuries he sustained. As to the statements made to first responders, the trial court found that "C.W.'s life was in jeopardy from severe bleeding," "he was in and out of consciousness," he was "in considerable pain," and the circumstances were not "conducive to reflective thought." It, therefore, found that the statements constituted excited utterances, admissible under Evid.R. 803(2).

9.

{¶ 28} Mayes argues that the trial court erred in admitting the first and second sets of statements. Problematically, Mayes not only failed to preserve this issue for appeal—he affirmatively waived any error.

{¶ 29} After the trial court informed the parties of its ruling on the State's motion in limine, trial counsel asked the court to "note [his] objection for the record." However, when the State presented the evidence at trial, the trial court asked whether he had any objection to the publication and admission of Exhibits 2 (the 9-1-1 call), 3 (footage from Officer's Humason's body-worn camera), and 5 (footage from Officer Cairl's body-worn camera). Mayes not only failed to object to the evidence—he affirmatively stated that he had "no objection" to its publication and admission.

{¶ 30} "'[A] waiver occurs where a party affirmatively relinquishes a right or an objection at trial; a forfeiture occurs where a party fails to assert a right or make an objection before the trial court in a timely fashion.'" *State v. Huguley,* 2017-Ohio-8300, ¶ 27 (9th Dist.), quoting *State v. Fitzgerald*, 2007-Ohio-701, ¶ 8 (9th Dist.). "An objection that has been forfeited may be assigned as error on appeal if a showing of plain error is made." *Id.,* citing *Fitzgerald* at ¶ 8. "'Where a party has affirmatively waived an objection, however, the error may not be asserted on appeal even if it does amount to plain error.'" *Id.,* quoting *Fitzgerald* at ¶ 8.

{¶ 31} Here, Mayes did not merely forfeit his objection by failing to object to the admission of the evidence—he affirmatively stated that he had "no objection" to the evidence, thereby waiving the alleged error altogether. *See State v. Fitts,* 2020-Ohio-1154, ¶ 22 (6th Dist.) ("Because counsel for Fitts specifically stated that she had no

objection to the admission of the audio and video recordings, Fitts has waived the right to claim error."); *State v. Alley,* 2024-Ohio-115, ¶ 40 (6th Dist.) ("By affirmatively stating no objection to the admission of the recordings at trial, appellant waived his appellate challenge to this admission."). Because Mayes waived error with respect to the admission of the hearsay statements, we find his first assignment of error not well-taken.

## 2. Crim.R. 29

{¶ 32} In his second assignment of error, Mayes argues that the trial court erred when it denied his Crim.R. 29(A) motion for acquittal as to the charges of felonious assault and discharge of a firearm over a public roadway. The jury acquitted Mayes of discharging a firearm over a public roadway, therefore, we address this assignment of error only as it relates to the felonious-assault charges.

{¶ 33} A motion for acquittal under Crim.R. 29(A) challenges the sufficiency of the evidence. *State v. Brinkley*, 2005-Ohio-1507, ¶ 39. The denial of a motion for acquittal under Crim.R. 29(A) "is governed by the same standard as the one for determining whether a verdict is supported by sufficient evidence." *State v. Tenace*, 2006-Ohio-2417, ¶ 37.

{¶ 34} Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins,* 78 Ohio St.3d 380, 386 (1997). In reviewing a challenge to the sufficiency of evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Internal citations omitted.) *State v. Smith*, 80 Ohio St.3d 89, 113 (1997). In making that determination, the

11.

appellate court will not weigh the evidence or assess the credibility of the witnesses. *State v. Walker,* 55 Ohio St.2d 208, 212 (1978). "Rather, we decide whether, if believed, the evidence can sustain the verdict as a matter of law." *State v. Richardson*, 2016-Ohio-8448, ¶ 13. Naturally, this requires "a review of the elements of the charged offense and a review of the state's evidence." *Id.*

{¶ 35} Mayes was convicted of both R.C. 2903.11(A)(1) and (2). Under R.C. 2903.11(A), "[n]o person shall knowingly . . . (1) [c]ause serious physical harm to another . . ."; or (2) "[c]ause or attempt to cause physical harm to another . . . by means of a deadly weapon . . . ." Mayes challenges the "knowingly" element of the offenses.

{¶ 36} Mayes asks us to find that the State failed to present evidence that he "knowingly" caused or attempted to cause serious physical harm because the shooting was "an apparent random shooting spree" and resulted in injury to "a random person." He maintains that there was no testimony as to the shooter's mental state at the time of the shooting, no evidence that he was aware of the probability of harm caused by a "random shooting," no evidence that he was aware that he would cause serious physical harm to the victim, and no evidence of a relationship between the victim and the shooter to explain why the shooter would start shooting in the general vicinity of the victim.

{¶ 37} "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. . . ." R.C. 2901.22(B). Ohio courts have recognized that a person acts "knowingly" for purposes of R.C. 2903.11 when he or she fires

12.

multiple shots in the direction of residential homes or in a place where there is a risk of injury to one or more persons. *See State v. Salinas,* 124 Ohio App.3d 379, 391 (11th Dist. 1997); *State v. Gregory,* 90 Ohio App.3d 124, 131 (12th Dist. 1993); *State v. Wilson,* 2024-Ohio-776, ¶ 24 ("Intentionally shooting toward or in the vicinity of another person when there is a risk of injury meets the 'knowingly' element of felonious assault.").

{¶ 38} Here, the State presented evidence that the shooting occurred in a residential neighborhood in the middle of the afternoon, while children were playing outside. Eight shots were fired, and at least one struck a home and two struck garbage cans that were stored right next to a house. This evidence was sufficient to support the "knowingly" element of felonious assault. We would also add that contrary to Mayes's assertions, there *was* evidence that Mayes knew C.W. and the two were feuding, suggesting that C.W. was targeted and the shooting was not random.

{¶ 39} We find Mayes's second assignment of error not well-taken.

### 3.   Manifest Weight

{¶ 40} In his third assignment of error, Mayes challenges his felonious-assault convictions. He argues that the jury's conclusions with respect to the "knowingly" and identity elements of the offenses were against the manifest weight of the evidence.

{¶ 41} When reviewing a claim that a verdict is against the manifest weight of the evidence, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice

13.

that the conviction must be reversed and a new trial ordered. *Thompkins,* 78 Ohio St.3d 380, 387. We do not view the evidence in a light most favorable to the state. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson,* 2012-Ohio-6068, ¶ 15 (6th Dist.), citing *Thompkins* at 388. Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *State v. Martin,* 20 Ohio App.3d 172, 175 (1st Dist. 1983).

{¶ 42} Although under a manifest-weight standard we consider the credibility of witnesses, we must nonetheless extend special deference to the jury's credibility determinations given that it is the jury who has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 2012-Ohio-616, ¶ 14 (6th Dist.). "The jurors are free to believe some, all, or none of each witness' testimony and they may separate the credible parts of the testimony from the incredible parts." *State v. Hill*, 2024-Ohio-2744, ¶ 24 (7th Dist.), citing *State v. Barnhart*, 2010-Ohio-3282, ¶ 42 (7th Dist.), citing *State v. Mastel*, 26 Ohio St.2d 170, 176 (1971). "When there are two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, we will not choose which one is more credible." *Id.,* citing *State v. Gore*, 131 Ohio App.3d 197, 201 (7th Dist. 1999).

{¶ 43} Mayes argues that the State presented evidence of recklessness at best. He claims that "without evidence of a relationship between the victim and the shooter, this

14.

court should find that the state simply didn't prove the element of knowingly, or of appellant being aware that he would probably cause the victim to be shot, or that the residence would likely sustain the damage from a deflected bullet."

{¶ 44} As to identity, Mayes argues that his convictions were against the manifest weight of the evidence because his identity was proven by hearsay statements; C.W. was the only person to identify him; and C.W. said that the shooter was not wearing a shirt, while the ShotSpotter report indicated that there were "multiple males" present, wearing black or red. Mayes contends that there was no testimony from law enforcement that anyone responded to the scene of the shooting to investigate the identity of the shooters, and he complains that witnesses at the scene did not appear for trial and refused to provide available ring camera video from their personal residences.

{¶ 45} We have already addressed and rejected Mayes's arguments concerning proof of "knowingly." The State presented evidence that eight shots were fired in C.W.'s direction in a residential neighborhood during the middle of the day when children were also outside. The jury did not lose its way in concluding that this evidence supported the element that Mayes knowingly caused serious physical harm or attempted to cause physical harm by means of a deadly weapon.

{¶ 46} As to his identity as the shooter, we have already rejected Mayes's hearsay arguments. A perpetrator's identity may be established by the testimony of only one witness, and here, C.W. identified Mayes. Mayes is wrong that no law enforcement immediately responded to the scene of the shooting. Moreover, while men wearing red and black were observed running from Pinewood, this does not mean that there was no

15.

one else present at the time of the shooting. In fact, there was evidence that C.W. saw K.M. at the scene. Finally, the absence of other witnesses or video evidence does not render Mayes's conviction against the manifest weight of the evidence. In sum, we cannot say that the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that Mayes's convictions must be reversed and a new trial ordered.

{¶ 47} We find Mayes's third assignment of error not well-taken.

### B.     The State's Appeal

{¶ 48} Under R.C. 2953.08(B)(2), the State may appeal a sentence if it is contrary to law. In its assignments of error, the State argues that the trial court erred when it failed to include in the sentencing entry (1) the proper code section for Count 2, (2) the felony level for Count 3, and (3) an indefinite prison term for Counts 2 and 3. We address these errors out of order.

{¶ 49} As to the failure to include indefinite prison terms for Counts 2 and 3, Count 2 merged with Count 1 for purposes of sentencing. Because Mayes was not sentenced on Count 2, there is no need for the trial court to specify an indefinite prison term for that offense.

{¶ 50} As to Count 3, because Mayes was convicted of a "qualifying felony of the first or second degree," as defined by R.C. 2929.144, the State is correct that the trial court was required to impose an indefinite maximum term. Its failure to do so renders the sentence contrary to law. *See State v. Diamond*, 2024-Ohio-473, ¶ 13 (8th Dist.) (holding that where a defendant has been convicted of a qualifying offense subject to indefinite

16.

sentences and the trial court fails to impose an indefinite maximum sentence, the sentence is contrary to law). Accordingly, we reverse and remand for resentencing on Count 3 so that the trial court can impose the mandatory indefinite maximum prison term. We find the State's third assignment of error well-taken, in part, and not well-taken, in part.

{¶ 51} As to the proper code section for Count 2, the sentencing entry indicates that Mayes was convicted of R.C. 2903.11(A)(*1*) and (D)(1)(a). In fact, as to Count 2, Mayes was indicted on—and the jury found him guilty of—R.C. 2903.11(A)(*2*) and (D)(1)(a). On remand, the trial court shall correct this clerical error. We find the State's first assignment of error well-taken.

{¶ 52} As to the felony level for Count 3, it is true that the sentencing entry omits this information. Neither Crim.R. 32(C) nor R.C. 2929.19 explicitly requires the degree of the offense to be specified in the sentencing entry. Nevertheless, given that we are remanding to correct other errors, the trial court is directed to include in its sentencing entry the degree of the offense of Count 3. We find the State's second assignment of error well-taken.

### III. Conclusion

{¶ 53} We conclude that Mayes affirmatively stated that he had "no objection" to the admission of the statements made during the 9-1-1 call and C.W.'s statements while he was being treated by first responders. He has, therefore, waived any alleged error in the admission of this evidence. We find Mayes's first assignment of error not well-taken.

{¶ 54} The State presented sufficient evidence that Mayes's knowingly caused serious physical harm to another or caused or attempted to cause physical harm by means

of a deadly weapon. It presented evidence that Mayes fired eight shots in the direction of C.W. in a residential neighborhood in the middle of the afternoon while children were outside playing. We find Mayes's second assignment of error not well-taken.

{¶ 55} As to the elements of "knowingly" and the identity of the shooter, we cannot say that the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that Mayes's convictions must be reversed and a new trial ordered. We find Mayes's third assignment of error not well-taken.

{¶ 56} As to the proper code section for Count 2, Mayes was indicted on—and the jury found him guilty of—R.C. 2903.11(A)(*2*). We reverse and remand for the trial court to correct this clerical error in the sentencing entry. We find the State's first assignment of error well-taken.

{¶ 57} As to the felony level for Count 3, the sentencing entry omits this information. Although neither Crim.R. 32(C) nor R.C. 2929.19 explicitly requires the degree of the offense to be specified in the sentencing entry, given that we are remanding to correct other errors, the trial court is directed to include in its sentencing entry the degree of the offense of Count 3. We find the State's second assignment of error well-taken.

{¶ 58} As to the failure to include indefinite prison terms for Counts 2 and 3, Count 2 merged with Count 1 for purposes of sentencing, therefore, there is no need for the trial court to specify an indefinite prison term for that offense. As to Count 3, because Mayes was convicted of a "qualifying felony of the first or second degree," the trial court was required to impose an indefinite maximum prison term. Because it failed

18.

to do so, the sentence is contrary to law.  We reverse and remand for resentencing on Count 3. We find the State's third assignment of error well-taken, in part, and not well-taken, in part.

{¶ 59} We affirm, in part, and reverse, in part, the May 7, 2025 judgment of the Lucas County Court of Common Pleas.  This matter is remanded to the trial court for proceedings consistent with this decision.  Mayes is ordered to pay the costs of this appeal under App.R. 24.

Judgment affirmed in part and reversed in part.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, P.J.

_____
JUDGE

Christine E. Mayle, J.

_____
JUDGE

Myron C. Duhart, J.
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.